STATE of Wisconsin, Plaintiff-Respondent,

v.

Juan G. GRACIA, Defendant-Appellant-Petitioner.

IN the MATTER OF the refusal of Juan G. GRACIA:

CITY OF MENASHA, Plaintiff-Respondent,

v.

Juan G. GRACIA, Defendant-Appellant-Petitioner.

Supreme Court

*No. 2011AP813–CR & 2011AP814.*
*Oral argument October 23, 2012.—Decided January 31, 2013.*

2013 WI 15

(Also reported in 826 N.W.2d 87.)

490

For the defendant-appellant-petitioner, there were briefs filed by *John Holevoet* and *Holevoet Law Office, LLC,* Madison, and oral argument by *John Holevoet.*

For the plaintiff-respondent, the cause was argued by *David H. Perlman,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. N. PATRICK CROOKS, J. This is a review of an unpublished decision of the court of appeals[1] that affirmed the circuit court. This case involves two distinct issues. The first issue is whether a warrantless search of Gracia's bedroom[2] was a valid exercise of the community caretaker exception to the warrant requirement under the federal and state constitutions.[3] The second

---

[1] *State v. Gracia,* No. 2011AP813–CR, *City of Menasha v. Gracia,* No. 2011AP814, unpublished slip op. (Wis. Ct. App. Dec. 28, 2011).

[2] The parties do not dispute that a search occurred for purposes of the Fourth Amendment when the officers entered Gracia's bedroom and talked to him, which led to their discovery that Gracia was intoxicated.

[3] The circuit court also found that Gracia unreasonably refused to submit to a test for intoxication. The refusal and the appeal from the judgment of conviction for fourth-offense OWI have been consolidated.

issue is factually unrelated and involves whether Gracia can successfully collaterally attack his second operating a motor vehicle under the influence (OWI)[4] from 1998 on the grounds that he did not validly waive his right to counsel.

¶ 2. Gracia moved to suppress evidence obtained during and resulting from the search on the grounds that the police had illegally entered his bedroom despite his objection and without a warrant. The circuit court for Winnebago County, the Honorable Barbara H. Key presiding, denied Gracia's motion to suppress, holding that the police officers were exercising their community caretaker function when they entered Gracia's bedroom after tracking him from a single-car accident, and their actions were constitutionally permitted. Gracia also challenged a prior conviction, claiming that he had not validly waived his right to counsel in that case. The circuit court found that Gracia validly waived his right to counsel during his 1998 no contest plea hearing. Gracia subsequently pleaded no contest to operating with a prohibited alcohol content, fourth offense, in violation of Wis. Stat. § 346.63(1)(b)[5] with an alcohol fine enhancer under § 346.65(2)(g)1. The court of appeals affirmed on both issues.

¶ 3. We hold that the circuit court properly denied Gracia's motion to suppress. The test for the community caretaker exception was recently laid out by this

---

[4] Wis. Stat. § 346.63, entitled "Operating under influence of intoxicant or other drug," prohibits drivers from both operating a motor vehicle under the influence and operating a motor vehicle with a prohibited alcohol content. *See* Wis. Stat. § 346.63 (2009–10). To avoid unnecessary confusion, this opinion will usually refer to violations of Wis. Stat. § 346.63 as "OWI" unless specifically noted.

[5] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

court in *State v. Pinkard* and looks at whether a search or seizure took place, whether the police exercised a bona fide community caretaker function, and whether the intrusion was reasonable based on the attendant circumstances. *State v. Pinkard,* 2010 WI 81, ¶ 29, 327 Wis. 2d 346, 785 N.W.2d 592. Here, the police were following up on a major single-vehicle accident which left the front end of the car driven by Gracia extensively damaged and a traffic pole completely knocked down. They validly entered the home on consent of Gracia's brother and after his brother broke open Gracia's bedroom door, without any prompting by the police, reasonably exercised their community caretaker function when they crossed the threshold into Gracia's bedroom. The police acted on their concern that Gracia might have sustained a significant injury in the auto accident. Given these facts, the warrantless search was reasonable under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Wisconsin Constitution.

¶ 4. We further hold that despite a technically deficient plea colloquy, Gracia knowingly, intelligently, and voluntarily waived his right to counsel before he pleaded no contest to his second OWI in 1998, a violation of Wis. Stat. § 346.63(1)(b) (1997–98), operating with a prohibited alcohol concentration.[6] He understood the difficulties and disadvantages of self-representation. He had familiarity with the role of

---

[6] Wisconsin has a progressive penalty system for OWIs in which prior convictions are used to determine the appropriate penalties. *See* Wis. Stat. § 346.65. The penalty structure for these convictions changes depending on the number of prior similar convictions the driver has. Wisconsin Stat. § 343.307 enumerates relevant prior conduct for penalties under Wis. Stat. § 346.65.

lawyers, and he made a cost-benefit decision not to hire an attorney because he was guilty and the district attorney offered him the minimum penalty. The circuit court properly denied the collateral attack of his earlier conviction and thus considered the 1998 conviction in determining that Gracia had three prior relevant convictions.

## I. BACKGROUND

¶ 5. This case presents two distinct issues for this court to decide. Each issue has unrelated facts. The first issue is related to a warrantless search, and the second is a collateral attack of a prior conviction. The facts of each will be presented in turn.

¶ 6. The City of Menasha Police Department received a report of a traffic signal down that was impeding traffic. The signal, located on a median, had been completely ripped from the ground, and was lying half in the median and half in the road. It appeared from the scene that a vehicle had struck the signal and then left. At the scene, the police found a mangled license plate lying next to the damaged traffic signal; the license plate number 228JJD was listed as belonging to a 1999 Buick Regal LS.

¶ 7. After some investigation,[7] the police arrived at a trailer home where Juan G. Gracia ("Gracia") lived,

---

[7] The license plate found at the scene was registered to Jesus Gracia-Valenzuela. The officers went to the address connected to the license plate and did not find the vehicle. They also checked another address for the car's registered owner on Jefferson Street. The police then learned from the people at that address that the Gracias no longer lived there. The police checked another address. Then a family member of the Gracias told police that Juan Gracia usually drove that vehicle and gave the police his address on Wendy Way.

and they found the Buick Regal in the driveway. The Buick had clearly been in an accident. Its front license plate was missing. There was significant front-end damage with pieces of the front bumper missing. There were yellow markings on the side of the door panel. The front end had been caved in, as if the car had struck a pole, and a pair of eyeglasses and a hat sat on the front passenger seat. According to the officers, the damage seemed fresh.

¶ 8. When the police officers arrived at the trailer home, the lights were off inside, and no one answered the door. As the police were about to leave, a pickup truck arrived driven by Jaime Gracia, who told police he was Gracia's brother and lived at that residence with Gracia. Jaime Gracia stated that his brother should be inside. The officers asked if they could come inside, explaining that they were worried about Gracia's potential injuries and that they needed to make sure he was okay. Jaime Gracia asked them to wait outside and went into the house by himself. After several minutes, he allowed the officers inside and told them that Gracia had locked himself in his bedroom. Jaime Gracia brought the officers to Gracia's bedroom door. Inside his room, Gracia yelled in Spanish and English, telling them to "go away." Both the officers and Jaime Gracia tried the door handle. One of the officers, Officer Lenss, testified that Jaime Gracia then "put his shoulder through the door and opened the bedroom door." Once the door was open, the officers entered the room and made contact with Gracia, who was lying on the bed. The officers observed Gracia's bloodshot eyes, slurred speech, and the strong odor of intoxicants emanating from Gracia. Gracia eventually admitted to driving the Buick. The officers then arrested Gracia for operating a motor vehicle while intoxicated.

¶ 9. Gracia moved to suppress the evidence of his intoxication obtained after the police entered his bedroom. At the suppression hearing, the State argued that the community caretaker exception to the warrant requirement applied. The circuit court agreed and denied the suppression motion.[8] Gracia pleaded no contest to operating a motor vehicle with a prohibited alcohol content, fourth offense, in violation of Wis. Stat. § 346.63(1)(b) and then appealed. The court of appeals affirmed the circuit court's denial of the suppression motion. On appeal, Gracia also collaterally attacked a prior conviction as the result of an invalid waiver of the right to counsel. Additional relevant facts will be incorporated throughout the opinion.

## II. STANDARD OF REVIEW

■■

¶ 10. This court reviews motions to suppress by examining the constitutional challenge to the search. "Whether police conduct has violated the constitutional guarantees against unreasonable searches and seizures is a question of constitutional fact." *State v. St. Martin*, 2011 WI 44, ¶ 16, 334 Wis. 2d 290, 800 N.W.2d 858 (citations omitted). We defer to the circuit court's findings of facts while "independently apply[ing] those historical facts to the constitutional standard." *Id.*

---

[8] Gracia also refused to take a test for intoxication. The circuit court held a joint suppression and refusal hearing. The only grounds Gracia alleges for the refusal is the constitutionality of the search. The refusal will not be dealt with separately in this opinion because in this situation, it rises and falls with the community caretaker exception analysis. Because we find the entry a valid exercise of the community caretaker function, the refusal was unreasonable.

¶ 11. We review de novo "[w]hether a defendant knowingly, intelligently, and voluntarily waived his Sixth Amendment right to counsel." *State v. Ernst,* 2005 WI 107, ¶ 10, 283 Wis. 2d 300, 699 N.W.2d 92. In that review, we apply constitutional principles to the facts of the case. *State v. Klessig,* 211 Wis. 2d 194, 204, 564 N.W.2d 716 (1997).

## III. ANALYSIS

¶ 12. First we determine if the police exercised a valid community caretaker function; if they did not, and no other exception applied, the warrantless search would violate both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Wisconsin Constitution. Second we look at whether Gracia can collaterally attack his 1998 conviction for second-offense OWI on the grounds that he did not knowingly, intelligently, and voluntarily waive his right to counsel because he was not aware of the difficulties and disadvantages of self-representation.[9]

### A. Police Search and
### the Community Caretaker Function

¶ 13. There are two searches in this case—the entry of the trailer and the entry of the bedroom. Because Jaime Gracia consented to the police entry to the trailer and Gracia does not object to that, we look

---

[9] If a collateral attack is successful, the prior conviction cannot be used to enhance the penalties for the current conviction. *See State v. Peters,* 2001 WI 74, ¶ 22, 244 Wis. 2d 470, 628 N.W.2d 797.

only at the search of the bedroom.[10] Gracia argues that the search of his bedroom was not a valid exercise of the police's community caretaker function. The State asks this court to affirm the circuit court's finding that the community caretaker function was validly exercised in this situation.

■■

¶ 14. The community caretaker exception is analyzed in the same manner under both the state and federal constitutions. *State v. Kramer,* 2009 WI 14, 315 Wis. 2d 414, ¶ 18, 315 Wis. 2d 414, 759 N.W.2d 598; *Pinkard,* 327 Wis. 2d 346, ¶ 14. This court looks at "the totality of the circumstances as they existed at the time of the police conduct." *Kramer,* 315 Wis. 2d 414, ¶ 30.

■■

¶ 15. This court recently interpreted the community caretaker function of police in *Pinkard,* 327 Wis. 2d 346. That case laid out a three-step test, with four relevant factors in deciding the third step, placing the

---

[10] The consensual entry into the trailer home is more like *Illinois v. Rodriguez,* 497 U.S. 177 (1990), than *Georgia v. Randolph,* 547 U.S. 103 (2006), because when consent was being given to enter the home, no one objected. The United States Supreme Court has allowed warrantless entry when police obtain voluntary consent of an occupant who shares authority over the common area with a co-occupant even when later the co-occupant objects to the use of evidence obtained. *See Illinois v. Rodriguez,* 497 U.S. 177. In *Georgia v. Randolph,* 547 U.S. 103, the United States Supreme Court held that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Id.* at 106. *See also State v. St. Martin,* 2011 WI 44, ¶ 6, 344 Wis. 2d 290, 800 N.W.2d 858 (holding that "the rule stated in *Randolph* does not apply . . . because we conclude that St. Martin was not physically present at what the United States Supreme Court called the 'threshold colloquy.' ")

burden of proof on the State. *Id.*, ¶ 29. The steps are as follows:

> (1) [W]hether a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, whether the police were exercising a bona fide community caretaker function; and (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home.

*Id.*, ¶ 29. In examining the third step, "we balance the public interest or need that is furthered by the officers' conduct against the degree and nature of the intrusion on the citizen's constitutional interest." *Id.*, ¶ 41. The four factors considered in this balancing test are as follows:

> (1) [T]he degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the search, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Id.*, ¶ 42 (citations omitted).

¶ 16. The parties do not dispute that the entry into the bedroom constituted a search within the meaning of the Fourth Amendment. The parties disagree on the second and third steps of the community caretaker test.

¶ 17. The second step requires determining whether the officers had an objectively reasonable basis to believe Gracia was hurt and in need of assistance, so that they were exercising a bona fide community care-

taker function. *Pinkard,* 327 Wis. 2d 346, ¶ 29. To make that determination, we look at the totality of the circumstances at the time of the conduct. *Id.,* ¶ 31.

¶ 18. Gracia argues that the police did not have an objectively reasonable basis to believe Gracia needed assistance. Gracia cites *Cady v. Dombrowski,* 413 U.S. 433 (1973), reviewing a writ of habeas corpus from a conviction upheld in *State v. Dombrowski,* 44 Wis. 2d 486, 171 N.W.2d 349 (1969), for the proposition that for police conduct to be a bona fide community caretaker function it must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady,* 413 U.S. at 441. Gracia acknowledges that in *Kramer,* 315 Wis. 2d 414, we interpreted the "totally divorced" language in *Cady* as requiring only an objectively reasonable basis, but Gracia argues that the subjective intent of police that included a desire to, in part, investigate the reason for the crash, cuts against the reasonableness of the officers' belief that Gracia was hurt. *See Id.,* ¶ 31.

¶ 19. As we explained in *Kramer,* "in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." *Id.,* ¶ 30. *Kramer* described the nature of police work as "multifaceted" and explained that "the officer may have law enforcement concerns, even when the officer has an objectively reasonable basis for performing a community caretaker function." *Id.,* ¶ 32. Furthermore, *Kramer* underscored the perverse nature of not allowing police to have any investigatory purpose while carrying out their community caretaker function:

502

[T]o interpret the "totally divorced" language in *Cady* to mean that an officer could not engage in a community caretaker function if he or she had any law enforcement concerns would, for practical purposes, preclude police officers from engaging in any community caretaker functions at all. This result is neither sensible nor desirable.

*Id.,* ¶ 34. In light of "the multifaceted nature of police work," in the totality of the circumstances, the officers' subjective intent does not invalidate an otherwise reasonable exercise of the community caretaker function.[11]

¶ 20. Gracia argues that the officers did not have an objectively reasonable basis to believe he was hurt. He thinks that this case is more like *State v. Ultsch,* 2011 WI App 17, 331 Wis. 2d 242, 793 N.W.2d 505, than *State v. Pinkard* because the only evidence the officers used to determine Gracia might have been hurt was a damaged car. In *Ultsch,* the police investigated a traffic accident where a driver had smashed into a brick wall and fled the scene in the vehicle. 331 Wis. 2d 242, ¶ 2. The police found the damaged car at the end of a long driveway. *Id.,* ¶ 2. When the police saw someone leaving the house who turned out to be Ultsch's boyfriend, they did not express any concern about the driver's safety. *See id.,* ¶ 3. The police eventually went to the house, entered the unlocked front door, and found their way to the driver's bedroom where she was sleeping. *Id.,* ¶ 4. They transported her to the sheriff's department where they performed both field sobriety and chemical

---

[11] The subjective intent cuts both ways here. As explained above, the officers continually showed their concern for Gracia by explaining to Gracia's brother that Gracia might be hurt. This continued concern could reasonably be viewed as demonstrating the subjective belief of the police that Gracia was hurt and needing assistance.

breath tests, after which they arrested her. *Id.,* ¶ 5. The circuit court denied her motion to suppress evidence on the grounds that the police were exercising a bona fide community caretaker function. *Id.,* ¶¶ 6–7. The court of appeals disagreed, holding that it did not believe that the police had "an objectively reasonable basis to believe Ultsch was in need of assistance." *Id.,* ¶¶ 21, 30 (citations omitted).

¶ 21. Although some of the facts here appear similar to those in *Ultsch,* the officers in this case had an objectively reasonable basis to believe Gracia needed assistance. First, there was more damage to Gracia's vehicle than there was to Ultsch's. In *Ultsch,* the damage was confined to the left front fender and was described by the court of appeals as "limited damage." *Id.,* ¶¶ 19, 28. Here, not only was a traffic signal completely knocked down, but the front end of the vehicle was essentially caved in, pieces of the bumper were left at the scene, and the front license plate was entirely ripped off. Second, the police consistently stated their concern for Gracia in this case, whereas in *Ultsch,* the police did not even tell Ultsch's boyfriend about their suspicion that Ultsch might be injured and in need of assistance. Although it is only one factor to be taken into consideration in judging the objective beliefs of police, the subjective intent of the officers is relevant. In this situation, the police immediately told Gracia's brother about their concern for Gracia's safety.

¶ 22. There were other facts supporting an objectively reasonable view that Gracia was hurt. As discussed above, the damage at the scene of the accident and to the car observed at Gracia's house was extensive. In addition, Gracia's brother appeared concerned about Gracia's safety. After going into the house without police, he returned to the front door and allowed the

police inside the house, and he subsequently broke open the door to Gracia's bedroom. The brother's actions provide further support that there was a genuine belief that Gracia might be in need of assistance. For all of these reasons, the police were exercising a bona fide community caretaker function.

¶ 23. Even if the police have a bona fide purpose, the third step of the analysis requires that the community caretaker function be reasonably exercised by the officers. *Pinkard,* 327 Wis. 2d 346, ¶ 29. This determination is made by "balancing a public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the citizen," *Kramer,* 315 Wis. 2d 414, ¶ 40, and the four factors discussed earlier guide the determination. None of the factors is, by itself, dispositive. *See generally, id.*

¶ 24. In *Pinkard* the community caretaker function was reasonably exercised by the officers because the public interest in the search outweighed Pinkard's privacy interests. In *Pinkard,* the police got an anonymous tip that there were two people sleeping near what appeared to be illegal drugs. *Pinkard,* 327 Wis. 2d 346, ¶ 2. The police went to investigate the tip and confirmed its accuracy. *Id.,* ¶ 3. After announcing their presence with no reaction from the occupants, who appeared to be sleeping, the police entered the house. *Id.,* ¶ 4. Once inside, police found a digital scale and drugs, along with a firearm. *Id.,* ¶ 5. Pinkard moved to suppress the evidence because there was no warrant. *Id.,* ¶ 6. The circuit court found that the police conduct was a valid exercise of the community caretaker function, and we agreed. *Id.,* ¶¶ 7, 11. We will now examine the four factors in regard to Gracia's situation.

¶ 25. The first factor in the balancing test is the degree of the public interest and the exigency of the situation. *Id.,* ¶ 42. The public has a substantial interest in ensuring the safety of drivers in serious traffic accidents. *See State v. Ziedonis,* 2005 WI App 249, ¶ 29, 287 Wis. 2d 831, 707 N.W.2d 565 (finding a significant public interest in a situation where "the officers did not know the physical condition of the person and reasonably concluded that the situation was an emergency.") There was also some exigency in this situation. The police promptly began investigating the accident and were at Gracia's home within about 45 minutes of the accident being reported. If Gracia had been seriously injured in the accident, quick medical assistance would have been necessary.

¶ 26. The second factor looks at the circumstances surrounding the search, including the "time, location, the degree of overt authority and force displayed." *Pinkard,* 327 Wis. 2d 346, ¶ 42. This factor also weighs in favor of the reasonable exercise of the community caretaker function in this case. Although the search took place in a private place, the privacy interests infringed upon were minimized by the facts of this situation. The police displayed significantly less overt authority here than in *Ultsch.* The police entered Gracia's home on the consent of his brother, Jaime Gracia, and did not enter Gracia's bedroom to check on him until his brother broke open Gracia's door.[12] The

---

[12] There is nothing to indicate that the police did anything to encourage Jaime Gracia to break open the door. In fact, officer Matthew Lenss testified at a hearing that he did not ask Jaime to break open the door, stating, "I actually remember looking at Officer Swenson in disbelief thinking to myself, wow, he just put his shoulder through the door. I never asked him to do that."

police were escorted by a seemingly concerned co-tenant the entire time they were in Gracia's home. In contrast, the police in *Ultsch* entered the house without permission and then walked around unattended until they found Ultsch sleeping in bed. 331 Wis. 2d 242, ¶ 4. Furthermore, here the officers did not use any force throughout the entire interaction. Both the brother and the police tried the handle of the bedroom door, but when the door did not open, the police made no further attempts to gain entry. The only person to use any force in this situation was Gracia's brother, but since there was no evidence that the police encouraged that behavior, his actions should not be imputed to the police. No one argues that the officers brandished their weapons or threatened anyone involved. Essentially, the officers found themselves in front of an open door and walked across the threshold to check on someone they thought was injured from a serious car accident, which was not unreasonable.

¶ 27. The third factor is irrelevant because the search was not of an automobile, so we look next at the fourth factor: the possible alternatives and their effectiveness to the actual intrusion by police. *See Pinkard,* 327 Wis. 2d 346, ¶ 42. Here, one possible alternative would have been to have Gracia's brother evaluate and monitor his safety. While this appears sensible, the effectiveness of such an alternative is questionable in this situation. Gracia's brother was very excited by this situation—so excited that he forcibly broke open Gracia's bedroom door. It is unclear that he would have been able to safely administer care to an injured person or to get the help needed. Additionally, police officers are trained to deal with situations like this, they were already there, and they believed that Gracia might be injured; therefore, although an alternative existed, it

did not itself make this an unreasonable exercise of the community caretaker doctrine.

¶ 28. Gracia emphasizes the fact that while inside his bedroom, he yelled for the persons outside the door to "go away." Gracia believes that this shows that the officers' community caretaker purpose was not bona fide, and also that it made what the police did unreasonable. Therefore, he says, the second and third steps of the community caretaker exception analysis are not satisfied. While the fact that Gracia told the police to go away does make this case distinguishable from *Pinkard* (where the occupants of the house were unresponsive to the police yelling), it does not necessarily lead to the conclusion that the police could not exercise a community caretaker function under such circumstances. Gracia's responsiveness is not dispositive. In *Pinkard,* the only reason the police had for thinking that the people needed assistance was the fact that they were sleeping next to drugs. *See id.,* ¶ 39. Here, as noted earlier, there was a serious car accident that the police were looking into. *Pinkard* stressed the importance of the occupants' unresponsiveness because in that case, if the people were alert, there would have been no reason at all to think they would need any assistance. Here, Gracia could still have been seriously hurt even though he wanted police to go away.[13]

---

[13] In a footnote in his brief, Gracia states, "[e]ven if he had been injured, Mr. Gracia would have a constitutional right to decline unwanted medical assistance," citing *Cruzan by Cruzan v. Dir. Mo. Dep't of Health,* 497 U.S. 261, 278 (1990) and *Lenz v. L.E. Phillips Career Dev. Ctr.,* 167 Wis. 2d 53, 63, 482 N.W.2d 60 (1992). Petitioner's Brief at 17 n.1. This argument is undeveloped, and we do not usually address undeveloped arguments. *See Saddle Ridge Corp. v. Board of Review for Town of Pacific,* 2010 WI 47, ¶ 46 n.23, 325 Wis. 2d 29, 784 N.W.2d 527. Further, this assertion does not change our analysis of whether the police were

¶ 29. The facts of this case, when balanced in light of the totality of the circumstances, lead us to the conclusion that this was a reasonable exercise of the community caretaker function. The police were in the home by consent with legitimate concern for Gracia. Although Gracia yelled through the door for them to "go away," Gracia's brother broke open the bedroom door. The police crossed the threshold and immediately noticed Gracia's intoxication. This is somewhat akin to a plain view situation: the person the police were concerned about was right in front of them, and they talked to him.[14] This was a very different situation than if the police themselves had broken open the bedroom door to check on someone they thought was injured.

¶ 30. Under the totality of the circumstances, the community caretaker exception to the warrant requirement resulted in permissible police conduct. The community caretaker function was reasonably exercised by the police officers because the public interest in the search outweighed Gracia's privacy interests.

exercising a bona fide community caretaker function and whether they reasonably exercised that function.

[14] The plain view exception to the warrant requirement requires four things:

> The police must have a prior justification for the intrusion which placed them in the position to observe the evidence in plain view, the evidence must be in plain view, the discovery must be inadvertent, and the item seized, in itself or in itself with facts known to the officer at the time of the seizure, provides probable cause to believe there is a connection between the evidence and criminal activity.

*State v. McGovern,* 77 Wis. 2d 203, 210, 252 N.W.2d 365 (1977). The situation the police found themselves in after Jaime Gracia broke open the door has many of the same characteristics of a plain view discovery.

### B. Collateral Attack of 1998 Conviction

¶ 31. Due to the fact that the charge was fourth-offense OWI, Gracia also collaterally attacks his 1998 no contest plea on the grounds that he did not knowingly, intelligently, and voluntarily waive his right to counsel.

¶ 32. At the July 6, 1998, plea hearing in the circuit court for Outagamie County, the Honorable Michael W. Gage presiding, Gracia pleaded no contest to second-offense operating with a prohibited alcohol content. At the plea hearing, the ordinary question-answer colloquy found in Wis JI–Criminal SM-30 was not used. Instead, the judge asked questions of Gracia and learned the following facts: Gracia was 23 years old at the time, had graduated from high school, had attended some college, had been working the same job for three years, and was earning $11.50 per hour. The judge also talked to Gracia about his rights, explaining that Gracia had a right to an attorney. He asked if Gracia had decided to proceed pro se, explaining that Gracia may earn enough money to hire an attorney. He further explained that Gracia may qualify for appointment of an attorney, and if he did not qualify, Gracia could still get an appointed lawyer but would need to reimburse the court for the costs of the appointed attorney. The judge also confirmed that Gracia had not looked into obtaining counsel.

¶ 33. On August 3, 2010, the circuit court held a collateral-attack hearing to determine if Gracia knowingly, intelligently, and voluntarily waived his Sixth Amendment right to counsel before he pleaded no contest to his second OWI in 1998. Both Gracia and the State agree that Gracia made a prima facie showing that the 1998 waiver was invalid because the judge

accepting the waiver of counsel did not use a colloquy which included an explanation of the ways that an attorney might be helpful to him. In other words, there was not a significant explanation of the difficulties and disadvantages of self-representation. At the collateral attack hearing, Gracia stated that he did not hire an attorney in 1998 because he was guilty and the State had recommended the minimum. Gracia also asserted that he did not know during the 1998 hearing that a lawyer could look into defenses other than innocence. Gracia admitted that in 1998 he understood that a lawyer could "go to court" for him and that he had some familiarity with lawyers through television. He was also aware of the O.J. Simpson trial.

¶ 34. At the hearing, the circuit court found that Gracia's testimony was "forthright to an extent . . . [a]lthough somewhat self-serving when indicating that he had no idea what an attorney could do." The court noted that Gracia had finished high school and did not have education deficiencies. The circuit court stated:

> I'm going to find in this case that he made the conscious decision. He knew basically that a lawyer would be able to possibly help him out but he decided not to because he just didn't think that in the end result – it was more of a cost benefit analysis and that's why he didn't consider talking to the lawyer.

Because of these findings, the circuit court held that Gracia knowingly, intelligently, and voluntarily waived his right to an attorney in his 1998 plea hearing; therefore, his collateral attack to his second OWI conviction failed, making the charge that he faced a fourth offense. Gracia appealed. The court of appeals affirmed.

¶ 35. This court reviews de novo whether a defendant validly waived his or her right to counsel although we benefit from the analysis of the circuit court and the court of appeals. *Ernst,* 283 Wis. 2d 300, ¶ 10. This court illustrated the requirements for a valid waiver of counsel in *Klessig,* 211 Wis. 2d 194.

> To prove such a valid waiver of counsel, the circuit court must conduct a colloquy designed to ensure that the defendant: (1) made a deliberate choice to proceed without counsel, (2) was aware of the difficulties and disadvantages of self-representation, (3) was aware of the seriousness of the charge or charges against him, and (4) was aware of the general range of penalties that could have been imposed on him.

*Id.* at 206. A defendant makes a prima facie showing by showing a violation of these colloquy requirements and can then attempt to collaterally attack that prior conviction. *Ernst,* 283 Wis. 2d 300, ¶ 25. After the prima facie case is made, the State must then prove by clear and convincing evidence that the plea was made knowingly, intelligently, and voluntarily. *Id.,* ¶ 27.

¶ 36. As noted above, the State and Gracia agree that he made a prima facie showing because the judge accepting his waiver did not sufficiently cover the requirements in the colloquy. Gracia specifically challenges whether he was made aware of "the difficulties and disadvantages of self-representation," and therefore did not knowingly, intelligently, and voluntarily waive his right to counsel in 1998. Gracia cites *Pickens v. State,* 96 Wis. 2d 549, 292 N.W.2d 601 (1980), for the proposition that to satisfy that requirement he must "have an awareness of the technical rules governing the

proceedings and an attorney's role during them." Petitioner's Reply Brief at 9. *Pickens* states only that the defendant must have "an awareness that there *are* technical rules . . . and that presenting a defense is not a simple matter of telling one's story." *Id.* at 563 (emphasis added). We are persuaded by the court of appeals' recent interpretation of *Pickens* that the law requires that the defendant "understand the role counsel could play in the proceeding," not that the defendant must understand every possible defense. *State v. Schwandt,* No. 2011AP2301–CR, unpublished slip op., ¶ 14 (Wis. Ct. App. May 16, 2012).

¶ 37. The 1998 and 2010 hearings demonstrate that Gracia knowingly, intelligently, and voluntarily waived his right to counsel in 1998. At the 2010 hearing, Gracia explained that he did not hire an attorney in 1998 because he was guilty and the recommendation was for the minimum. This demonstrates a calculated decision on Gracia's part not to spend the money to hire an attorney in such a situation. The judge in 2010 found that Gracia's testimony was "somewhat self-serving when indicating that he had no idea what an attorney could do," pointing to the fact that Gracia had no educational deficiencies and he had completed high school and attended college briefly. Gracia testified 12 years after he initially waived his right to counsel, he had additional convictions in the intervening years, and at that point he faced an enhanced penalty for his 1998 conviction. We agree with the circuit court's determination that when he waived his right to counsel Gracia made a cost-benefit decision and knew what he was giving up.

¶ 38. Gracia also briefly raises the point that the court in 1998 did not make a finding of competency to

proceed pro se. As the court of appeals noted, he does not argue that he was not competent to proceed pro se. There is nothing in the record that would support such a determination. Gracia graduated from high school and attended college for a brief period of time studying engineering. He does not appear to have any problems that would cause him to lack competence to proceed pro se. *Klessig,* 211 Wis. 2d at 212.

¶ 39. Because he knowingly, intelligently, and voluntarily waived his right to counsel, his waiver was valid, and the prior conviction stands.

## IV. CONCLUSION

¶ 40. We hold that the circuit court properly denied Gracia's motion to suppress. The test for the community caretaker exception was recently laid out by this court in *Pinkard* and looks at whether a search or seizure took place, whether the police exercised a bona fide community caretaker function, and whether the intrusion was reasonable based on the attendant circumstances. *Pinkard,* 327 Wis. 2d 346, ¶ 29. Here, the police were following up on a major single-vehicle accident which left the front end of the car driven by Gracia extensively damaged and a traffic pole completely knocked down. They validly entered the home on consent of Gracia's brother and after his brother broke open Gracia's bedroom door, without any prompting by the police, reasonably exercised their community caretaker function when they crossed the threshold into Gracia's bedroom. The police acted on their concern that Gracia might have sustained a significant injury in the auto accident. Given these facts, the warrantless search was reasonable under the Fourth

Amendment of the United States Constitution and Article 1, Section 11 of the Wisconsin Constitution.

¶ 41. We further hold that despite a technically deficient plea colloquy, Gracia knowingly, intelligently, and voluntarily waived his right to counsel before he pleaded no contest to his second OWI in 1998, a violation of Wis. Stat. § 346.63(1)(b) (1997–98), operating with a prohibited alcohol concentration. He understood the difficulties and disadvantages of self-representation. He had familiarity with the role of lawyers, and he made a cost-benefit decision not to hire an attorney because he was guilty and the district attorney offered him the minimum penalty. The circuit court properly denied the collateral attack of his earlier conviction and thus considered the 1998 conviction in determining that Gracia had three prior relevant convictions.

*By the Court.*— The decision of the court of appeals is affirmed.

¶ 42. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I join Justice Prosser's dissent. I write separately to discuss the interplay of the consent doctrine and the community caretaker function. I recognize that consent and community caretaker are two distinct exceptions to the Fourth Amendment's warrant requirement.

¶ 43. An unaddressed issue in the present case is how the defendant's unequivocal refusal to permit the search of his bedroom affects the community caretaker analysis. More specifically, I ask whether the community caretaker exception can justify a warrantless search when there is an explicit and unequivocal refusal by the defendant to permit entry so that he may be taken care of—thus thwarting the justification for the community caretaker exception.

¶ 44. The defendant clearly and explicitly told police officers to "go away." This is the same unequivocal refusal to permit entry at the threshold for which the United States Supreme Court rendered a warrantless search unreasonable in *Georgia v. Randolph,* 547 U.S. 103 (2006).

¶ 45. Notwithstanding the unaddressed issue of the effect of refusal on the analysis of the caretaker function, in the present case, we have neither consent nor a valid community caretaker exception.

¶ 46. I am authorized to state that Justices ANN WALSH BRADLEY and DAVID T. PROSSER join this opinion.

¶ 47. DAVID T. PROSSER, J. *(dissenting)*. The primary issue presented in this case is whether police entry into the defendant's bedroom without a warrant was lawful under the Fourth Amendment.[1] The majority concludes that the entry, resulting in a search and an arrest, was permitted by the community caretaker exception to the warrant requirement. I disagree and respectfully dissent.

I

¶ 48. The Fourth Amendment to the United States Constitution reads as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

---

[1] This court has ordinarily interpreted the protections of the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution as coextensive. *State v. Artic,* 2010 WI 83, ¶ 28, 327 Wis. 2d 392, 786 N.W.2d 430, *cert. denied,* 131 S. Ct. 671 (2010) (citing *State v. Johnson,* 2007 WI 32, ¶ 20, 299 Wis. 2d 675, 729 N.W.2d 182). Hence, the analysis in this dissent also applies to Article I, Section 11 of the Wisconsin Constitution.

searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

¶ 49. Although the Fourth Amendment protects a variety of privacy interests in a variety of settings, the chief evil identified in the text is the unauthorized physical entry of a person's home. *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972).

¶ 50. Warrantless searches are deemed per se unreasonable, "subject only to a few specifically established and well-delineated exceptions."[2] Thus, police may not enter a person's home without a warrant *unless* they are operating under one of the well-delineated exceptions. This is true even when a person in the home would be subject to arrest without a warrant if the person stepped outside.

¶ 51. The most obvious exceptions to the warrant requirement for the search of a home are consent[3] and exigent circumstances,[4] including hot pursuit. The war-

---

[2] *Katz v. United States*, 389 U.S. 347, 357 (footnotes omitted); *see also Artic*, 327 Wis. 2d 392, ¶ 29 (citing *State v. Faust*, 2004 WI 99, ¶ 11, 274 Wis. 2d 183, 682 N.W.2d 371).

[3] *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). When relying upon consent to justify a lawful search, the government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Id.* at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). This court has adopted the *Schneckloth* standard for voluntariness. *Artic*, 327 Wis. 2d 392, ¶ 32 (citing *State v. Phillips*, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998)).

[4] *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (citing *McDonald v. United States*, 335 U.S. 451, 456 (1948); *Johnson v. United States*, 333 U.S. 10, 14–15 (1948)); *Warden v. Hayden*, 387 U.S. 294, 298–300 (1967).

rantless search of a probationer's home by a probation officer also is an established exception.[5] None of these exceptions apply to the search of the defendant's bedroom in this case.

¶ 52. Thus, the police rely on another exception: community caretaker. The community caretaker exception allows law enforcement officers, under certain circumstances, to use evidence they acquire while they are conducting "preventative patrol," "assist[ing] those who cannot care for themselves," "creat[ing] and maintain[ing] a feeling of security in the community," and "provid[ing] other services on an emergency basis."[6] 3 Wayne R. LaFave, *Search and Seizure,* § 6.6, at 595 (5th ed. 2012) (citing 1 ABA Standards for Criminal Justice § 1–2.2 (2d ed. 1980)). The evolution of this exception in Wisconsin case law is instructive.

¶ 53. The seminal case for the community caretaker principle is *Cady v. Dombrowski,* 413 U.S. 433 (1973). In *Cady,* a case with Wisconsin origins, police officers arrested the defendant for drunk driving after a one-car accident. *Id.* at 435–36. The defendant informed the officers that he was a Chicago police officer, and the local officers began to act on the belief that "Chicago police officers were required by regulation to carry their service revolvers at all times." *Id.* at 436. The officers' initial check of the passenger compartment of the vehicle and of the defendant's person did not produce a revolver. *Id.* Shortly thereafter, police had the defendant's car towed from the accident scene to a

[5] *Griffin v. Wisconsin,* 483 U.S. 868, 880 (1987).

[6] *See also State v. Anderson,* 142 Wis. 2d 162, 169 n.3, 417 N.W.2d 411 (1987) (citing *State v. Chisholm,* 696 P.2d 41, 43 (Wash. App. 1985)) (describing community caretaking functions as law enforcement performing services in addition to traditional enforcement activities).

privately owned garage. *Id.* Later, an officer returned to the car to continue looking for the service revolver.[7] *Id.* at 436–37. While examining the passenger compartment, the officer spotted an object with blood on it, and then found more evidence of a possible crime in the car's trunk. *Id.* at 437.

¶ 54. At his first-degree murder trial, the defendant argued that certain evidence found in the passenger compartment and trunk when the local officer searched for the service revolver was unconstitutionally seized. *See id.* at 434. The Supreme Court ultimately disagreed, holding that law enforcement's actions in towing the vehicle and attempting to locate the service revolver did not require a warrant under the Fourth Amendment. The Court said:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*

*Id.* at 441 (emphasis added).

---

[7] Police officers attempted to retrieve the revolver "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Cady v. Dombrowski,* 413 U.S. 433, 443 (1973).

¶ 55. *Cady* stressed the "distinction between motor vehicles and dwelling places." *Id.* at 447. This distinction was repeated in *South Dakota v. Opperman,* 428 U.S. 364, 367 (1976), where the Court observed that it had "traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment." Thus, "warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not." *Id.* (citations omitted). As a result, numerous courts have ruled that the community caretaker exception applies only to motor vehicle searches. LaFave, § 6.6, at 595 n.4 (citing *Ray v. Twp. of Warren,* 626 F.3d 170 (3d Cir. 2010); *United States v. Bute,* 43 F.3d 531 (10th Cir. 1994); *United States v. Erickson,* 991 F.2d 529 (9th Cir. 1993); *United States v. Pichany,* 687 F.2d 204 (7th Cir. 1982)). However, when this court recognized the community caretaker exception for the first time in *Bies v. State,* 76 Wis. 2d 457, 471, 251 N.W.2d 461 (1977), it applied the exception to a much different set of facts than those in *Cady.*

¶ 56. In *Bies,* a police officer patrolled an alley in the middle of the night in response to a noise complaint about a garage in the alley. *Id.* at 460–61. A light in a garage went out as the officer's car approached. *Id.* at 461. Because the main door of the garage was shut, the officer walked to the rear of the garage where he found an open doorway with a missing door. *Id.* After shining his flashlight into the garage, the officer saw 25 to 50 feet of three-inch telephone cable on the ground. *Id.* He went back to his car to inform police headquarters. *Id.* at 461–62. After another officer arrived, the officers went into the garage, took a piece of the cable, and left. *Id.* at 462. The officers realized that they had stumbled upon cable that only telephone companies could legally obtain. *Id.* at 475.

¶ 57. The *Bies* court stated that the community caretaker exception justified the first officer checking on the noise complaint and going from the alley to the rear of the garage—in the curtilage of the defendant's home—to further investigate the source of the reported noise. *Id.* at 471. "Checking noise complaints bears little in common with investigation of crime," the court said. *Id.* Thus, it was not unreasonable for the officer to walk to the rear of the garage, where he discovered the rear door missing, rather than stop at the closed overhead automobile door. *Id.* at 472. At that point, the officer was justified in going into the open garage under the plain view exception to the warrant requirement, not the community caretaker exception. *Id.* at 471–72. In other words, the community caretaker exception brought the officer in *Bies* to the threshold of the garage door in the curtilage of the home, but it was the plain view exception that allowed officers to cross the threshold into the garage.

¶ 58. The court of appeals examined the community caretaker function ten years later in *State v. Anderson*, 142 Wis. 2d 162, 417 N.W.2d 411 (1987). Two police officers noticed Anderson's vehicle approaching their car while they were on patrol. *Id.* at 164. One of the officers had previously received complaints about Anderson parking his car in private parking spots, so that the officer wanted to talk to him about this issue. *Id.* at 164–65. When Anderson turned away down an alley, the officers followed and pulled him over. *Id.* at 165. After Anderson stopped, the officers noticed that he was trying to conceal something, and they saw a leather object protruding from under the seat. *Id.* The officers ordered Anderson out of the car and found a loaded gun and several knives after a search of the car. *Id.* Like *Bies*, the *Anderson* facts involved routine police

conduct, not focused examination of criminal activity, that led inadvertently to the discovery of criminal evidence.

¶ 59. The court of appeals in *Anderson* set out a three-step test for evaluating claims of community caretaker functions:

> [W]hen a community caretaker function is asserted as justification for the seizure of a person, the trial court must determine: (1) that a seizure within the meaning of the fourth amendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual.
>
> As to the last factor—weighing the public need and interest against the intrusion—relevant considerations include: (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Anderson,* 142 Wis. 2d at 169–70 (footnotes omitted).

¶ 60. In *State v. Kelsey C.R.,* 2001 WI 54, 243 Wis. 2d 422, 626 N.W.2d 777, this court applied the community caretaker exception, leading to the warrantless search or pat-down of a juvenile. Two police officers found Kelsey alone in the dark in a high-crime area of Milwaukee and they were concerned that she was a runaway. *Id.,* ¶ 1. She had her hood up and was huddled in front of a closed store. *Id.,* ¶ 4. The officers asked Kelsey some questions and thought that her answers were evasive. *Id.,* ¶ 5. They told her to stay where she was, but she fled. *Id.* The officers caught up

to Kelsey, and later called a female officer to conduct a pat-down search, before giving the juvenile a ride home in a squad car. *Id.*, ¶¶ 6–7. To the officers' surprise, the pat-down search revealed a loaded handgun. *Id.*, ¶ 7. Kelsey moved the circuit court to suppress the results of the search. *Id.*, ¶ 8. The court held that the initial encounter with Kelsey was not a seizure but that if it was, it was permissible under the community caretaker exception. *Id.*, ¶ 51.

¶ 61. The lead opinion in *Kelsey C.R.* applied the three-step process laid out by the court of appeals in *Anderson. Id.*, ¶¶ 36–37. The lead opinion assumed for the purposes of analysis that a seizure of the juvenile occurred within the meaning of the Fourth Amendment, satisfying step one of the three-step test. *Id.*, ¶ 36. In considering step two, the juvenile apparently conceded "that the police were, at least at some point, performing a bona fide community caretaker activity by checking to see if Kelsey was a runaway." *Id.* Finally, in considering the four factors within the third step of the test, the *Kelsey C.R.* court concluded that the public need and interest outweighed the privacy of Kelsey. *Id.*, ¶ 37. Specifically, the court pointed to the strong public interest in locating runaway children, the discovery of a juvenile alone in a dangerous neighborhood after dark, the lack of alternatives to the officers asking the juvenile direct questions about her situation, and her disobedience of their order to "stay put." *Id.* Thus, the lead opinion determined there was a valid exercise of the community caretaker exception to a warrantless seizure of an individual.

¶ 62. Eight years later, in *State v. Kramer,* 2009 WI 14, 315 Wis. 2d 414, 759 N.W.2d 598, this court once again applied the community caretaker exception in the context of an automobile parked on the side of a county

road. The hazard lights were flashing on Kramer's vehicle, which was legally parked on the side of the highway after dark. *Id.,* ¶ 4. A sheriff's deputy activated his police car's emergency lights and stopped behind Kramer's vehicle so that he could check to make sure Kramer was all right. *Id.,* ¶ 5. The deputy walked up to Kramer's vehicle and asked if Kramer needed help. *Id.,* ¶ 7. Kramer's response suggested that he was intoxicated, so the deputy arrested him. *Id.* Kramer moved to suppress evidence of his intoxication on the ground that the deputy had seized him without probable cause or reasonable suspicion. *Id.,* ¶ 8.

¶ 63. In *Kramer,* we concluded that the "totally divorced" language in *Cady* did not require that the attending officer must rule out any possibility of criminal activity before the community caretaking action is bona fide—the second step of the *Anderson* test. *Id.,* ¶¶ 21, 30. Rather, we held "that in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." *Id.,* ¶ 30. "To conclude otherwise would ignore the multifaceted nature of police work and force police officers to let down their guard and unnecessarily expose themselves to dangerous conditions." *Id.,* ¶ 33 (citation omitted). Furthermore, the *Kramer* court, noting that *Kelsey C.R.* used the *Anderson* test in its community caretaker analysis, specifically adopted the three-part test. *Id.,* ¶ 21 n.8.

¶ 64. After considering all three steps of the test, the *Kramer* court concluded that the sheriff's deputy had an objectively reasonable basis for stopping his car behind the defendant's car parked on the side of a road.

*Id.,* ¶¶ 36–37. Furthermore, the deputy's first contact with the defendant was an offer of help. *Id.,* ¶ 37.

¶ 65. In *State v. Pinkard,* 2010 WI 81, 327 Wis. 2d 346, 785 N.W.2d 592, this court revisited the community caretaker exception. In that case, Milwaukee police received an anonymous tip about a house where two people were reported to be sleeping next to cocaine, money, and a digital scale, while the rear door was standing open. *Id.,* ¶ 2. Five officers from the Gang Crimes Unit of the Milwaukee Police Department responded to the tip and investigated, although one of the responding officers admitted that the residence "sounded like a drug house." *Id.,* ¶ 3. The officers knocked on the open rear door, announced their presence, and waited 30–45 seconds. *Id.,* ¶¶ 3–4. Receiving no response, the officers entered the residence, saw the sleeping individuals, and again loudly announced police presence. *Id.,* ¶ 5. Again, there was no response. *Id.* When the officers entered the bedroom, they saw cocaine, money, and a scale, just as the anonymous tipster had described. *Id.* The officers arrested one of the sleeping individuals, Pinkard, and seized evidence in plain view and a gun under the mattress. *Id.*

¶ 66. The circuit court denied Pinkard's motion to suppress a majority of the seized evidence because the officers' entry into the residence was a lawful community caretaker function; the court found the officer's testimony at the suppression hearing to be credible in that the officers were " 'inquir[ing] as to the health and safety of the individuals that were sleeping.' " *Id.,* ¶ 7.

¶ 67. The *Pinkard* majority affirmed the circuit court and court of appeals, determining that there was a valid exercise of the community caretaker function. *Id.,* ¶¶ 10–11. Applying *Anderson*'s three-step test, the majority first concluded that a search within the mean-

ing of the Fourth Amendment occurred. *Id.*, ¶ 30. Second, although "this is a close case," the court also concluded that there had been a bona fide community caretaker function because police received a reliable anonymous tip, the police were concerned about the welfare of the occupants, the information contained in the tip was true, and no one responded to the officers announcing their presence. *Id.*, ¶¶ 32–33. On the facts of the case, the majority contended, an officer would be reasonably concerned about the possibility of a drug overdose. *Id.*, ¶ 35. Finally, the *Pinkard* majority determined that the exercise of the community caretaker function was reasonable. *Id.*, ¶ 60. Essentially, the officers were faced with the possible exigencies of a drug overdose and individuals unable to look after themselves, no overt force was used, and no feasible alternatives existed. *Id.*, ¶¶ 46–60.

¶ 68. However, three members of the court were unwilling to go along with this expansion of the community caretaker exception. *Pinkard,* 327 Wis. 2d 346, ¶ 98 (Bradley, J., dissenting). The *Pinkard* dissenters noted that, for the first time, this court expanded the community caretaker exception to a warrantless entry and search of a home. *Id.*

¶ 69. The *Pinkard* dissent contended that the officers' alleged concern about the safety of the occupants was really following up a complaint about criminal activity. *Id.*, ¶ 83. Thus, the officers entered the Pinkard residence to conduct an investigation, not to perform a community caretaker function. Finally, the dissent argued that the execution of any community caretaker function in Pinkard's case was unreasonable: the entry was invasive and "consistent with a drug bust rather than a rescue." *Id.*, ¶¶ 95–96. Additionally, the

dissent observed that the officers did not seem to consider any alternatives to a warrantless entry. *Id.,* ¶ 96.

¶ 70. This historical review shows that the community caretaker exception was first recognized in the unsuspecting search of a towed vehicle. Until our decision in *Pinkard,* this court had never justified an unwarranted, unrequested police entry of a home on a community caretaker basis. What appeared to some members of the *Pinkard* court as a significant departure from the core principles of the exception is now being stretched and extended even more.

## II

¶ 71. In this case, a Menasha police officer, Matthew Lenss, was dispatched to investigate a yellow traffic light pole that was down at an important intersection. He found a dislodged license plate at the site of the smashed pole. A computer check showed that the plate belonged to a Buick Regal owned by Jesus Gracia-Valenzuela. Police went to three different addresses attempting to find the owner. At the third address, they were told that the vehicle they were searching for was usually driven by Juan Gracia (Juan) who lived at an address on Wendy Way.

¶ 72. At that address officers found the vehicle with extensive front-end damage, streaks of yellow paint, and a missing license plate. The officer looked inside the vehicle but saw no blood. The windshield was intact. The airbags had not been deployed.

¶ 73. The officer later testified that at this point, based on his experience, the possibility that an accident had been caused by an intoxicated driver "would be in the back of [his] mind." Thus, the police had evidence of

527

a driver who hit and damaged public property but fled the scene without reporting an accident, and they suspected that the driver had been drinking.

¶ 74. At the residence the police attempted to make contact with someone inside, but there were no lights on and no one answered the door. Just as police were getting ready to leave, Jaime Gracia (Jaime) drove up to the residence. Jaime informed the police that he lived at the residence with his brother Juan, that Juan normally drove the Buick Regal, and that he believed Juan was inside the residence.

¶ 75. Police asked Jaime if they could go inside the residence to make sure Juan was okay "based on the damage to the vehicle." Jaime told the officers to wait outside while he went inside the residence. Shortly thereafter, Jaime came back out and gave police permission to enter the residence. It was approximately 9:20 p.m. when police entered—nearly 40 minutes after police were dispatched to investigate the downed traffic light pole.

¶ 76. Jaime led police to a closed bedroom door. On the other side of the door, Juan was yelling in Spanish and English that he wanted everyone to "go away." Officer Lenss testified that both he and Jaime tried to open the bedroom door, but it was locked.[8] Officer Lenss then testified that Jaime, without prompting from the police, put his shoulder to the bedroom door and forced it open. Almost immediately, police crossed the threshold of the door into the bedroom and discovered Juan lying on the bed.

¶ 77. Officer Lenss testified that it was difficult to understand what Juan was saying, but that he could

---

[8] While Jaime gave police permission to come into the common areas of the house, neither Jaime nor Juan gave police permission to open the bedroom door.

tell Juan "was highly intoxicated." Juan's breath smelled of intoxicants, his eyes were bloodshot, and his speech was slurred. Juan admitted to the police that he drove the white Buick Regal. Officer Lenss administered several tests both inside and outside of the residence to determine Juan's level of intoxication. After failing several of these tests, Juan was placed under arrest for operating a motor vehicle while intoxicated.

¶ 78. Several major points are evident from these facts.

¶ 79. First, this case involves the entry of a private bedroom, not the search of a motor vehicle. Warrantless entry of a residence is more suspect and subject to stricter scrutiny than entry and search of a motor vehicle. *State v. Ultsch,* 2011 WI App 17, ¶ 18, 331 Wis. 2d 242, 793 N.W.2d 505 (citing *Pinkard,* 327 Wis. 2d 346, ¶ 20).

¶ 80. Second, police did not enter the bedroom with consent. On the contrary, Juan loudly told the officers to go away. This fact distinguishes Juan's case from *Pinkard,* where the inhabitants of the house did not respond at all to the loud announcement of police presence.

¶ 81. Third, Juan never opened a door. He did not answer the door when the police came to his residence, and he locked the door to his bedroom. This distinguishes this case from *Pinkard,* where the door to the house was open and the door to the bedroom was open.

¶ 82. Fourth, although the door to Juan's bedroom was open when the police entered, it was open only because Jaime forced it open. Jaime had authority to invite the officers into the house,[9] but he did not have

---

[9] *United States v. Matlock,* 415 U.S. 164, 171 (1974).

authority to invite police to enter Juan's bedroom.[10] A person who lacks authority to consent to an entry does not gain authority by forcing in a door.

¶ 83. Fifth, the officers were investigating one offense and suspected the commission of another—drunk driving. They pursued the driver of the hit-and-run vehicle to four different addresses. No argument can be made that their actions were "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady,* 413 U.S. at 441.

¶ 84. Sixth, although the officers repeatedly professed concern about the driver's medical condition, their expressions of concern always facilitated the investigation of the accident. Their expressions of concern helped them learn the identity of the driver and obtain his home address. They helped induce the cooperation of Jaime. There is no evidence, however, that the officers ever contacted local hospitals to see if a patient named Juan Gracia had come to the emergency room.[11] When they entered the residence with consent, they knew that Jaime was there to help his brother if his brother needed help. They never asked Juan personally if he needed medical assistance and did not see anything in the bedroom that impelled them to enter the room to provide medical assistance. In short, a crime-investigating, crime-solving purpose dominated

---

[10] *See State v. Kieffer,* 217 Wis. 2d 531, 577 N.W.2d 352 (1998) (father-in-law lacked authority to consent to search of loft area above garage that was under exclusive control of defendant and wife); *State v. Amrine,* 157 Wis. 2d 778, 783, 460 N.W.2d 826 (Ct. App. 1990) (police invited into home are presumed limited to the room they are brought into).

[11] The distance between the accident site and Juan's home —about two miles—is the same distance to the nearest hospital.

any other purpose in the officers' conduct, thereby disqualifying the police from using the community caretaker exception.

¶ 85. In terms of the traditional *Anderson* test:

¶ 1. A search and seizure within the meaning of the Fourth Amendment occurred when the police entered a private bedroom without a warrant and without consent to obtain evidence of a crime and obtained evidence that would justify the arrest of the defendant.

¶ 2. Even if a portion of police conduct could be described as "bona fide community caretaker activity," that portion was completely overshadowed by the law enforcement objectives of finding and arresting the person responsible for the traffic light pole accident. At some point before police entered Juan's bedroom, any "objective reasonable basis" to believe that Juan needed medical assistance disappeared.

¶ 3. The public need and interest did not outweigh the intrusion into the privacy of the defendant in his bedroom.

A. The police had Juan cold on a hit-and-run. They could have asked him to come out of his bedroom to discuss the accident. If he refused, they could have attempted to get a warrant while they stayed in the house. They had a witness in Jaime, who could have testified as to his brother's sobriety. There was simply no exigency that justified bursting into the bedroom.

B. In addition, the search and seizure occurred in a private residence. The police knew they could not enter the house without permission and did not. They tried the bedroom door but knew they could not themselves break it in. When Jaime acted, they abandoned their caution and barged in.

C. No automobile was involved in the search of the bedroom.

D. Alternatives were available, starting with a simple request to come out and talk. If Juan did not comply, again, the officers could have obtained a warrant for entry into the bedroom.

¶ 86. As noted above, warrantless searches are per se unreasonable subject only to a few specifically established and well-delineated exceptions. The Supreme Court has declared that these exceptions "have been jealously and carefully drawn." *Jones v. United States,* 357 U.S. 493, 499 (1958). They must be "confined in scope," *Terry v. Ohio,* 392 U.S. 1, 29 (1968), and "strictly circumscribed." *La Fournier v. State,* 91 Wis. 2d 61, 68, 280 N.W.2d 746 (1979) (quoting *Terry,* 392 U.S. at 25–26).

¶ 87. The dogged determination of the Menasha officers to find and arrest the person responsible for the light pole accident is expected and completely commendable. However, this laudable objective is necessarily governed by traditional Fourth Amendment principles. A legitimate end did not justify the means employed with respect to warrantless entry of the bedroom.

¶ 88. The community caretaker exception to the warrant requirement is sound constitutional doctrine and will be vigorously defended so long as it is applied within reasonable limits. These limits protect individual liberty *and* preserve the interests of law enforcement. When the community caretaker exception is applied without these limits, both liberty and the interests of law enforcement are bound to suffer.

¶ 89. For the foregoing reasons, I respectfully dissent.

¶ 90. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.