ANNETTE KINGSLAND ZIEGLER, J.
| 61. {concurring). I join the majority opinion. I write further to briefly explain why the officer here was not required to first administer a preliminary breath test ("PBT") to Dean Blatterman in order to have his blood tested at the hospital.[1] I also concur and write separately to further discuss why odor alone establishes probable *178 cause to arrest and test a serial offender, like Blatterman, who smells of intoxicants and is driving. We took this case to do more than apply previously existing probable cause principles. We accepted review in this case to decide whether there is probable cause to arrest and test a driver, who is subject to the .02% alcohol concentration limit,[2] based upon odor of alcohol alone.
¶ 62. Why is it important to address this issue? The courts and law enforcement face these real life determinations when evaluating whether probable cause to arrest exists for a .02% prohibited alcohol concentration ("PAC") offense, especially in light of Missouri v. McNeely, 569 U.S. _, 133 S. Ct. 1552 (2013). For example, what if the officer had sought a warrant to draw a suspected .02% PAC offender's blood based upon odor alone? Does probable cause exist or not? What if a law enforcement officer had asked a suspected offender — known to be a repeat operating-while-intoxicated ("OWI") offender, subject to a .02% PAC legal limit and smelling of intoxicants — to submit to a PBT, and the PBT was refused? Would the suspect be free to leave? Are officers on scene always required to obtain a PBT from a suspected .02% PAC offender? If a PBT is refused, is that, coupled with odor, enough for probable cause? What if the officer does not have a PBT device? Are officers without the lawful ability to pursue whether such chronic offenders are committing *179 the crime of operating with a .02% PAC or above?[3] What exactly is required to establish probable cause for the stand-alone crime, operating in violation of a .02% PAC limit? We should explain what we expect of our law enforcement and the courts. Now is the time to answer those pressing questions. I would conclude that odor of intoxicants alone establishes probable cause for the crime of operating with an alcohol concentration of .02% or above.
¶ 63. I reach my conclusion because the legislature has spoken by enacting legislation that prohibits a serial OWI offender, like Blatterman, from operating a motor vehicle with this exceedingly small amount of alcohol, .02%, in his system. The legislature essentially imposed an absolute sobriety standard by adopting the .02% limit for serial OWI offenders while they are operating a motor vehicle.[4] The legislature did not set such an extraordinarily low legal limit for first, second, or third offenders. In fact, most drivers are subject to a PAC legal limit of .08%, not a limit of .02%. Blatterman, however, was subject to this low legal limit, .02%, *180 because he had three prior OWI-related convictions.[5] When officers encountered him driving on March 19, 2013, knowing that he was subject to a .02% PAC legal limit and that he smelled of intoxicants, the officers were not wrong to pursue whether Blatterman was operating with a PAC. I would not limit this case to a discussion of probable cause for Blatterman. This court's role is not that of error correcting. We accept cases to discuss broader issues. I would do so and conclude that those serial offenders, such as Blatterman, who are subject to a .02% PAC limit, may be arrested and tested if they are operating a motor vehicle and smell as if they have been drinking alcohol. In other words, courts and law enforcement should know that probable cause, for these serial offenders, is established based upon odor of intoxicants alone.
I. THE OFFICERS HAD PROBABLE CAUSE TO ARREST AND TEST BLATTERMAN UNDER THE FACTS OF THIS CASE
¶ 64. Blatterman's traffic stop was not an ordinary OWI investigation. Blatterman was pulled over because his wife called police to report that he had driven away from their house after he tried to blow it up or start it on fire by drawing in carbon monoxide. She also reported that he might be intoxicated and that he had mentioned "suicide by cop" in the past. Officers subsequently found Blatterman's vehicle and performed a "high risk" traffic stop. Immediately after *181 being pulled over, Blatterman exhibited odd and potentially dangerous behavior. Contrary to the officers' orders, Blatterman exited his vehicle and began to approach the officers. He was wearing jeans, boots, and a short-sleeve shirt without a coat, although the temperature outside was freezing cold. Even more curiously, Blatterman continued walking toward the officers despite the fact that the officers were pointing guns at him and had ordered him to stop moving. His behavior was consistent with a desire to die through "suicide by cop." Blatterman finally stopped walking when he was six to eight feet from the front squad car. The officers told him to turn away and get onto the ground, but he continued facing the officers and knelt down. The officers then put Blatterman to the ground and handcuffed him. Deputy James Nisius later testified that "I smelled alcohol on him when I got up close to him."[6]
¶ 65. After Blatterman was placed in handcuffs, he told the officers that his chest hurt. Based on his chest pain, the officers were reasonably concerned that he may have impending health issues. Due to his wife's report that he had mentioned "suicide by cop" in the past and that he had been drawing carbon monoxide into the house, the officers were reasonably concerned that he may have been suicidal. Clearly, the officers were concerned about Blatterman's well-being. The officers then summoned emergency medical services ("EMS") to evaluate Blatterman's health, namely, his chest pain. In the meantime, the officers placed Blatterman in the back of a squad car, as he was not dressed appropriately for the cold weather. When EMS *182 arrived, Blatterman refused attention. After EMS talked to Blatterman, but before leaving the scene of the traffic stop, Deputy Nisius checked Blatterman's driving record and discovered that Blatterman, who smelled of intoxicants, had three prior OWI-related convictions and was therefore subject to a PAC legal limit of .02%. Deputy Nisius subsequently transported Blatterman to a hospital for an evaluation regarding his chest pain. Once at the hospital, Deputy Nisius informed the hospital staff that Blatterman had chest pain, was possibly suicidal, and had been exposed to carbon monoxide. Deputy Nisius also told the hospital staff, "there's potentially a need for a phlebotomist to do a legal blood draw."[7] Hospital staff examined Blatterman and found no concern with his chest pain. Blatterman told hospital staff that he was not suicidal. Deputy Nisius then removed Blatterman's handcuffs and administered field sobriety tests in the hospital examination room.[8] Hospital staff drew Blatterman's blood.[9] Blatterman's blood test results revealed that he had a blood alcohol concentration of .118%, well over the .02% limit to which he was subject while driving.
¶ 66. Under the facts of this case, the officers could not be expected to request a PBT before transporting an offender like Blatterman to the hospital. Officers stopped Blatterman in response to a serious *183 domestic complaint. Although he was driving normally, Blatterman exhibited undeniably strange, disobedient, and volatile behavior. He exited his vehicle after being told not to do so. He then walked straight toward the officers, who were pointing guns at him, after being told not to do so. He was wearing a short-sleeve shirt without a coat in freezing cold weather. His unusual behavior was consistent with the unusual behavior reported by his wife. In light of Blatterman's strange behavior and reported past remark about "suicide by cop," the officers had plenty of reason to take him into custody. Blatterman was also complaining of chest pain. The officers were certainly reasonable to transport him to the hospital and not administer any tests at the scene — even a PBT. To require an officer to ignore these facts and request a PBT, instead of responding to the immediate needs of the situation at hand, is inconsistent with our case law and common sense.[10]
f 67. In the case at issue, these legitimate concerns alone support the officers' decision to transport Blatterman to a hospital for testing without first requesting that he submit to a PBT. Should officers be expected to request a PBT breath sample from a driver who smells of alcohol, is subject to a .02% PAC legal limit, acts very strangely, is potentially dangerous, and *184 has chest pain? No. Our precedent does not require a PBT under these circumstances, and the majority opinion is correct not to require that here. However, we did not accept review of this case to recite existing precedent or to apply previously existing probable cause principles. Hence, I engage in the following analysis to address the more pressing issue — why we accepted review.
II. AN OFFICER HAS PROBABLE CAUSE TO ARREST AND TEST A MOTORIST IF THE MOTORIST EMITS AN ODOR OF INTOXICANTS AND THE OFFICER KNOWS THE MOTORIST IS SUBJECT TO A PROHIBITED ALCOHOL CONCENTRATION LEGAL LIMIT OF .02%
¶ 68. I write separately because I conclude that odor of intoxicants alone is sufficient to establish probable cause to arrest and further test an operator of a motor vehicle when the officer knows that the operator has three or more previous OWI-related convictions. When practical, a PBT will be a useful tool in determining whether to arrest and further test. In general, PBTs serve to bolster the probable cause analysis. However, a PBT is not always required and if it is refused by the chronic offender who is required not to exceed a .02% PAC while driving, I would conclude that probable cause to arrest exists based upon odor alone. Field sobriety tests may also be administered, but are not required, for the seemingly obvious reason that in order to exceed the .02% PAC legal limit, the operator need not exhibit any indicia of intoxication or impairment. Because the law requires that this class of serial drunk drivers maintain an alcohol concentration of less than .02% if operating a motor vehicle, probable cause must exist based on the odor of alcohol alone. *185 These repeat drunk drivers are already on notice that they place themselves at great risk of arrest if they ingest any amount of alcohol and get behind the wheel.
¶ 69. The law concerning probable cause is not new. Probable cause is required for an arrest to be valid. State v. Secrist, 224 Wis. 2d 201, 212, 589 N.W.2d 387 (1999) (citing State v. Mitchell, 167 Wis. 2d 672, 681, 482 N.W.2d 364 (1992)). "Probable cause to arrest is the quantum of evidence within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime." Id. (citations omitted). "There must be more than a possibility or suspicion that the defendant committed an offense, but the evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not." Id. (citing Mitchell, 167 Wis. 2d at 681-82). Probable cause to arrest depends on the totality of the circumstances. State v. Kennedy, 2014 WI 42, ¶ 21, 359 Wis. 2d 454, 856 N.W.2d 834. An officer may have probable cause to arrest a person for an OWI-related offense without administering a PBT.[11] See Cnty. of Dane v. Sharpee, *186 154 Wis. 2d 515, 519, 453 N.W.2d 508 (Ct. App. 1990) ("There is no question that, absent the preliminary breath test, probable cause existed for the arrest."); Cnty. of Jefferson v. Renz, 231 Wis. 2d 293, 316, 603 N.W.2d 541 (1999) ("An officer may request a PBT to help determine whether there is probable cause to arrest a driver suspected of OWI. . . ." (emphasis added)).
¶ 70. Given that a law enforcement officer must have probable cause in order to arrest, it is important to pay heed to the elements of the PAC offense and then evaluate what quantum of evidence satisfies probable cause for each element. This crime is not complex. The legislature enacted Wis. Stat. § 346.63(l)(b), which has only two elements: (1) operating a motor vehicle; (2) with a PAC. See State v. Alexander, 214 Wis. 2d 628, 651, 571 N.W.2d 662 (1997); Wis JI — Criminal 2660C. If a person has "3 or more prior convictions, suspensions or revocations, as *187 counted under [Wis. Stat. §] 343.307(1)," his or her PAC is .02%. Wis. Stat. § 340.01(46m)(c).
¶ 71. Specifically, the legislature has determined that for this unique group of repeat drunk drivers, .02%, not .08%, is a PAC. See 1999 Wis. Act 109, §§ 16d, I6e.[12] In adopting such a low legal limit, the legislature essentially required absolute sobriety of this group of drivers. The Legislative Reference Bureau has explained that "Act 109 require [d] that drivers with three or more prior convictions may not exceed an absolute sobriety standard of .02 BAC. (ABAC of .02 is considered 'absolute sobriety' because of the limitations in breath testing devices and the fact that the slight alcohol content of mouthwash or some medications can influence a test.)" Legislative Briefs, OWI Laws Revised, LB-00-7, at 1 (July 2000), available at http ://legis .wisconsin.gov/lrb/pubs/lb/ 001b7 .pdf.
¶ 72. Operating a motor vehicle with a PAC is a stand-alone crime. See Wis. Stat. § 346.63(l)(b). As for the first element, if one is driving, probable cause undoubtedly exists with respect to this element. The second element becomes the issue before the court. What information would lead a reasonable police officer to believe that the defendant's alcohol concentration probably is .02% or above? Not much. In my view, odor of intoxicants must be sufficient. No other indicia of intoxication can be required to establish probable cause for this crime for which intoxication has no significance. Clearly, the legislature did not contemplate intoxication or impairment when it chose .02% as *188 the legal limit. As the court in State v. Goss aptly recognized, "[t]he ordinary investigative tools employed in an investigation of an OWI case with a .08 PAC standard are of little or no use where the PAC standard is [.02] because the ordinary physical indications of intoxication are not typically present in a person with that level of blood alcohol content." State v. Goss, 2011 WI 104, ¶ 27, 338 Wis. 2d 72, 806 N.W.2d 918.
¶ 73. Simply stated, a person can commit a PAC offense without being or appearing intoxicated or impaired. A person who is subject to a .02% PAC legal limit could rarely, if ever, exhibit any sign of intoxication or impairment when operating with a PAC. To require more than odor of an intoxicant would require more than is legislatively contemplated.
¶ 74. Specifically, an operator who is subject to this low legal limit can certainly reach a .02% PAC without exhibiting any of the traditional indicia of intoxication. See State v. Muehlenberg, 118 Wis. 2d 502, 505, 347 N.W.2d 914 (Ct. App. 1984). In other words, such a prior offender need not be intoxicated or otherwise impaired in order to be in violation of the PAC law. Id.; see also State v. Bohacheff, 114 Wis. 2d 402, 414, 338 N.W.2d 466 (1983). For these offenders, the legislature must have intended that odor of intoxicants alone raises a red flag. A PAC violation is "highly plausible" when a person who is subject to a PAC legal limit of .02% operates a motor vehicle and smells of alcohol. Goss, 338 Wis. 2d 72, ¶ 26. An officer certainly has probable cause to arrest when a law violation is "highly plausible." See Secrist, 224 Wis. 2d at 212 (citation omitted) (explaining that probable cause to arrest requires more than suspicion or a possibility, but the evidence need not establish that guilt is more *189 likely than not). Indeed, in Secrist we held that probable cause to arrest may be based on odor. See id. at 217-18 ("We hold that the odor of a controlled substance may provide probable cause to arrest when the odor is unmistakable and may be linked to a specific person or persons . . . ."). To conclude that the odor of alcohol alone establishes probable cause to arrest and test an offender who is subject to a .02% PAC limit, is to afford proper deference to the legislature's determination that operating with even the smallest amount of alcohol — an alcohol concentration of .02% — is prohibited for those serial drunk drivers.
¶ 75. Thus, the legislature has spoken and set a particularly low PAC limit for a driver who has three or more prior OWI-related convictions. In other words, the legislature sent a strong message to those serial offenders not to drink and drive. Those serial offenders who want to test what amount of alcohol they can have and not reach .02% do so at great risk. Those drivers know that they place themselves at great risk of arrest if they have any alcohol in their system and get behind the wheel. If this court were to conclude that more than the odor of intoxicants is required to arrest a motorist subject to a .02% PAC legal limit, we would undermine, if not invalidate, the .02% PAC offense as a stand-alone crime. See Wis. Stat. §§ 346.63(l)(b), 340.01(46m)(c). Our court is to listen to the policy choices of the legislature, and here the law is clear.
¶ 76. Blatterman argues that Goss requires a PBT under all circumstances. It does not. In fact, Goss supports the conclusion that I reach today. The sole question before the Goss court was whether the officer had probable cause to request a PBT. Goss, 338 Wis. 2d 72, ¶ 2. The court concluded that a PBT may be requested of a prior offender who is subject to a .02% *190 PAC legal limit based upon odor alone. Id., ¶¶ 2, 25-27. The Goss court did not address whether a PBT was required in order to arrest someone for a PAC offense. The Goss court did not decide what happens if the operator refuses a PBT. Under a natural extension of Goss, an officer has probable cause to arrest a driver who smells of alcohol and is subject to a PAC legal limit of .02%, even if the driver does not exhibit strange behavior like Blatterman did. Although Blatterman is correct that probable cause to request a PBT is a lower standard than probable cause to arrest,[13] his grounds for arguing that odor alone is not probable cause to arrest a .02% PAC offender are not particularly persuasive.[14] Although those two standards are different, each standard is satisfied by the odor of alcohol on a driver who is subject to a .02% PAC legal limit.
*191 ¶ 77. Finally, I address why, even if we were to conclude that odor alone is sufficient in .02% PAC cases, law enforcement will most often resort to using a PBT first, if practicable. As a practical matter, an officer will likely request a PBT from a driver who smells of alcohol and who is subject to a PAC legal limit of .02%. Goss allows officers to do so based on odor alone. Requesting a PBT can help to resolve doubt as to whether such a driver has a .02% PAC or above. If the PBT results reveal that a motorist does not have a PAC, the officer may release the motorist, save time, and proceed onto other duties. An officer would not likely prefer to arrest such a driver, go through the required paperwork, transport the suspect to testing, perhaps spend time and significant resources to get a search warrant from a judge, sit at a hospital waiting for a blood draw, and all the time take one more officer off the street, when a PBT is a quick and easy tool at the officer's disposal. The practical nature of a PBT being used in most circumstances involving such a driver is apparent. Although Goss does not require an officer to request a PBT before arresting a driver who smells of alcohol and is subject to a PAC legal limit of .02%, Goss certainly instructs that an officer is allowed to do so. I have no doubt that law enforcement will most often request that a suspected .02% PAC offender submit to a PBT in lieu of all that ensues when someone is otherwise taken into custody.
¶ 78. When we decline to answer the issues for which we accepted review in this case, we leave significant uncertainty for the courts and law enforcement. We should answer whether odor of intoxicants alone is probable cause to arrest those operators who are subject to a .02% PAC legal limit. If the officers had requested that Blatterman submit to a PBT, what *192 would have happened if he refused? Goss does not answer that; we should. Could a driver like Blatterman, who exhibited very odd and potentially dangerous behavior, avoid being arrested and tested for a PAC violation because a PBT was not administered? Goss does not answer that; we should. Law enforcement and the courts could benefit from us answering whether odor alone is sufficient to establish probable cause for these serial offenders.
¶ 79. Although I join the majority opinion, I write separately to explain that Deputy Nisius had probable cause to arrest and test Blatterman based on the facts of this case. I would further conclude that odor of intoxicants alone establishes probable cause sufficient to arrest and test operators of motor vehicles who are subject to the .02% PAC legal limit. For the foregoing reasons, I respectfully concur.
¶ 80. I am authorized to state that Justice DAVID T. PROSSER joins this concurrence and that Chief Justice PATIENCE DRAKE ROGGENSACK joins section II of this concurrence.

 "Alcohol concentration" means "[t]he number of grams of alcohol per 100 milliliters of a person's blood" or "[t]he number of grams of alcohol per 210 liters of a person's breath." Wis. Stat. § 340.01(lv)(a), (b).

 Contrary to Wis. Stat. §§ 346.63(l)(b) and 340.01(46m)(c).

 "Beginning on January 1, 2001, [1999 Wis.] Act 109 require [d] that drivers with three or more prior convictions may not exceed an absolute sobriety standard of .02 BAC. (A BAC of .02 is considered 'absolute sobriety' because of the limitations in breath testing devices and the fact that the slight alcohol content of mouthwash or some medications can influence a test.)" Legislative Briefs, OWI Laws Revised, LB-00-7, at 1 (July 2000), available at http://legis.wisconsin.gov/lrb/pubs/lb/001b7. pdf. The Legislative Reference Bureau's "statements carry some weight" and its "analyses are entitled to consideration." Schilling v. State Crime Victims Rights Bd., 2005 WI 17, ¶ 22 n.7, 278 Wis. 2d 216, 692 N.W.2d 623 (citation omitted).

 OWI-related convictions include "prior convictions, suspensions or revocations, as counted under [Wis. Stat. §] 343.307(1)." See Wis. Stat. § 340.01(46m)(c). Specifically, Blatterman previously violated the OWI laws once in 1991 and twice in 1992, which makes the present offense a fourth offense.

 This quote comes from Deputy Nisius's testimony at a hearing on Blatterman's suppression motion, held on July 22, 2013.

 This quote comes from Deputy Nisius's testimony at a hearing on Blatterman's suppression motion, held on July 22, 2013.

 The record does not reflect why Deputy Nisius removed Blatterman's handcuffs and administered field sobriety tests, and the record does not reflect how Blatterman performed on the tests.

 This blood draw occurred before the United States Supreme Court's decision in Missouri v. McNeely. See supra note 1.

 Standard field sobriety tests are not required in order to arrest a suspect for an OWI-related offense. Tullberg, 359 Wis. 2d 421, ¶ 40 & n.22. A PBT is not required either. See Cnty. of Dane v. Sharpee, 154 Wis. 2d 515, 519, 453 N.W.2d 508 (Ct. App. 1990) ("There is no question that, absent the preliminary breath test, probable cause existed for the arrest."); Cnty. of Jefferson v. Renz, 231 Wis. 2d 293, 316, 603 N.W.2d 541 (1999) ("An officer may request a PBT to help determine whether there is probable cause to arrest a driver suspected of OWI. . .." (emphasis added)).

 There are many reasons why an officer might not request a PBT. Perhaps a motorist who is suspected of committing an OWI-related offense is unconscious or otherwise incapable of submitting to a PBT. See State v. Disch, 129 Wis. 2d 225, 236, 385 N.W.2d 140 (1986) (holding that the defendant was not conscious enough to give or withhold consent to submit to testing under Wis. Stat. § 343.305, Wisconsin's implied consent law). Perhaps the motorist is in need of medical care. See Tullberg, 359 Wis. 2d 421, ¶¶ 48-51 (upholding a blood draw of a suspected drunk driver who was hospitalized and in need of a CT scan). Perhaps the motorist is hospitalized and receiving medical attention. See State v. Seibel, 163 Wis. 2d 164, 182-83, 471 N.W.2d 226 (1991) (upholding a blood draw of *186 a suspected drunk driver who was receiving treatment at a hospital for an automobile accident). Perhaps the motorist is seriously injured. See State v. Wille, 185 Wis. 2d 673, 678-79, 682-85, 518 N.W.2d 325 (Ct. App. 1994) (upholding a blood draw of a suspected drunk driver who was admitted to an emergency room for injuries sustained in an automobile accident). Perhaps officers will encounter an accident scene that possibly resulted from drunk driving but they may not immediately know the identity of the driver responsible for the accident. See State v. Gracia, 2013 WI 15, ¶¶ 6-7, 40-41, 345 Wis. 2d 488, 826 N.W.2d 87 (upholding the arrest of a suspected drunk driver who fled the scene of an automobile accident); see also Tullberg, 359 Wis. 2d 421, ¶¶ 12-16 (explaining that the defendant and a passenger in his truck falsely told a detective that the defendant had not been driving his truck when it was involved in an OWI-related accident). For these reasons and many more, an officer might choose not to request a PBT.

 The 02% PAC legal limit took effect on January 1, 2001. See 1999 Wis. Act 109, § 91. This court decided Renz in 1999, and the traffic stop at issue in that case occurred in 1996, several years before the .02% PAC legal limit took effect. See Renz, 231 Wis. 2d at 296.

 Probable cause to request a PBT requires " 'a quantum of proof that is greater than the reasonable suspicion necessary to justify an investigative stop, and greater than the "reason to believe" necessary to request a PBT from a commercial driver, but less than the level of proof required to establish probable cause for arrest.'" State v. Goss, 2011 WI 104, ¶ 25, 338 Wis. 2d 72, 806 N.W.2d 918 (quoting Renz, 231 Wis. 2d at 317).

 It may be worthwhile to spend a few moments considering the facts of Goss and the case now before the court. Goss and Blatterman were both pulled over for reasons unrelated to suspicion of OWI. Neither Goss nor Blatterman were originally being investigated for OWI. Each of them was placed in a squad car for reasons unrelated to suspicion of OWI. Officers began to suspect both Goss and Blatterman of a PAC violation after placing them in squad cars. In each of the cases, the officers knew that the defendant was subject to a .02% PAC legal limit before requesting sobriety testing. In Goss the officer requested Goss to submit to a PBT, the results of which indicated that further testing could be pursued. In the present case, the officers did not ask Blatterman to submit to a PBT — for good reason (see section I of this concurrence.).