COURT OF APPEALS
DECISION
DATED AND FILED

April 14, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP523-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2017CT33**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

SHANNON G. POTOCNIK,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Taylor County: ANN KNOX-BAUER, Judge. *Affirmed.*

¶1 SEIDL, J.[1] Shannon Potocnik, pro se, appeals a judgment convicting him of operating a motor vehicle with a prohibited alcohol concentration (PAC) as a second offense. The conviction was entered on

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Potocnik's no-contest plea following the circuit court's denial of his motion to suppress. That motion sought to suppress the result of a warrantless chemical blood test obtained at a hospital after a law enforcement officer had entered Potocnik's house without a warrant. Potocnik argues the circuit court erred in concluding that: (1) the community caretaker exception to the Fourth Amendment's warrant requirement applied to permit the warrantless search of his house; and (2) Potocnik's warrantless blood draw did not violate the Fourth Amendment due to exigent circumstances. We affirm.

## BACKGROUND

¶2    The State charged Potocnik with operating a motor vehicle while intoxicated (OWI) and PAC for having been the suspected driver of a vehicle involved in a crash on May 15, 2017. Potocnik filed a motion to suppress the result of a chemical test of his blood, alleging that the warrantless entry by a law enforcement officer into his home and subsequent warrantless blood draw at a hospital violated his Fourth Amendment rights. The circuit court held an evidentiary hearing on the motion, at which Taylor County Sheriff's Department sergeant Anthony Schuett testified to the following facts.

¶3    At 1:25 a.m., a passerby called the sheriff's department's dispatch and reported a one-vehicle accident where the driver was absent from the scene. Schuett arrived at the scene shortly thereafter. Schuett observed skid marks on the roadway leading to a truck in a ditch laying on its driver's side. The truck had apparently hit a large pine tree, which was sheared off six to eight feet from the ground and was leaning into the adjacent woods. A large debris field surrounded the scene.

2

¶4    The truck was severely damaged. Both of its driver's side doors had been sheared off. The passenger's side door and window were intact, but that door was too damaged to open. The windshield was cracked but otherwise remained intact. The rear window was broken out, but due to the small size of the opening and damage, Schuett did not believe anybody would have been able to exit the truck through that window. Based on his training, experience, and the nature of the severe damage he observed, Schuett concluded that the truck's driver must have been ejected from the truck during the crash. However, Schuett could not immediately locate the driver or any other vehicle occupants.

¶5    Schuett and other law enforcement officers spent approximately one hour searching the area for the truck's occupants. Finding no person or a body, even after using thermal imaging, they concluded the truck's occupant or occupants were no longer in the area. Dispatch eventually informed Schuett that Potocnik was the truck's registered owner.

¶6    After learning Potocnik's registered address, Schuett then drove approximately eight miles to Potocnik's residence. Upon Schuett's arrival at about 2:33 a.m., Schuett observed a light on in the living room. The entry door to the home was located through the garage, and the garage's entry door was unlocked. Schuett entered the garage, knocked on the entry door to the house numerous times, opened that door, and announced himself. He heard no response.

¶7    Schuett exited the garage and climbed onto a railing located on a porch alongside the house and looked through a second story window. He observed a man lying in bed.

¶8    Schuett returned to his squad car to make phone calls, but as he was doing so, he saw through a living room window a naked man walking around the

first story of the house. Schuett recognized that man as Potocnik due to Schuett's prior contacts with him. Schuett returned to the house entry door and knocked again, but Potocnik "disappeared" and did not respond to Schuett. When Schuett opened the house door to announce himself again, this time he "heard someone moaning as if in pain." Schuett then entered the home because he believed someone was injured inside the house.

¶9 Schuett found Potocnik lying on a bed and could smell the odor of intoxicants. Potocnik told Schuett that he had been in an accident. Potocnik also admitted to having consumed "one or two" alcoholic beverages. When Schuett asked Potocnik if he needed an ambulance, Potocnik replied, "Sure, whatever man." Potocnik additionally had been "making noises … like he was in pain" and told Schuett that he was in pain.

¶10 An ambulance took Potocnik to a hospital, arriving at approximately 4:00 a.m.—two and one-half hours after Schuett arrived at the crash scene. Hospital staff began taking X-rays and CT scans of Potocnik. Schuett believed obtaining a search warrant for a blood draw would take at least one more hour. From prior experience, Schuett knew that Potocnik might need to be transported by helicopter to another facility for additional medical assistance. Due to his training and experience, Schuett also knew that alcohol in an individual's bloodstream dissipates over time. Schuett therefore instructed hospital personnel to draw Potocnik's blood without first obtaining a search warrant.

¶11 In a written decision, the circuit court denied Potocnik's suppression motion following briefing. The court determined that Schuett's warrantless entry into Potocnik's home was lawful under the community caretaker exception to the Fourth Amendment's warrant requirement. It concluded that, based on the totality

of the circumstances, Schuett "took progressive, minimally intrusive steps in order to respond to someone that he reasonably believed needed assistance." The court further concluded exigent circumstances existed for Potocnik's blood to be drawn without a warrant. Potocnik now appeals his second-offense PAC conviction, challenging only the denial of his suppression motion.[2]

## DISCUSSION

¶12 Potocnik argues the circuit court erred by denying his suppression motion because his right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and article I, section 11 of the Wisconsin Constitution was violated by Schuett's warrantless entry into Potocnik's home and the warrantless draw of his blood.[3] When reviewing the denial of a motion to suppress evidence, we uphold the circuit court's findings of fact unless clearly erroneous. *State v. Pinkard*, 2010 WI 81, ¶12, 327 Wis. 2d 346, 785 N.W.2d 592. However, the application of constitutional principles to the facts presents a question of law that we review de novo. *Id.*

*I. Schuett's warrantless entry into Potocnik's garage and home*

¶13 The Fourth Amendment protects against unreasonable searches and seizures. *Id.*, ¶¶12-13. Warrantless searches are considered per se unreasonable,

---

[2] A circuit court's order denying a motion to suppress evidence may be reviewed on appeal from a judgment of conviction notwithstanding a defendant's not-guilty plea. *See* WIS. STAT. § 971.31(10).

[3] Our supreme court has generally interpreted article I, section 11 to provide the same constitutional guarantees as those the United States Supreme Court has accorded in interpreting the Fourth Amendment. *See State v. Kramer*, 2009 WI 14, ¶18, 315 Wis. 2d 414, 759 N.W.2d 598.

subject to a few well-delineated exceptions. *Id.*, ¶13. One such exception, which the State argues applied here to permit Schuett's warrantless entry into Potocnik's home, involves a law enforcement officer acting as a "community caretaker." *See id.*, ¶14. The State has the burden of establishing that a warrantless entry into a home occurred pursuant to the community caretaker exception to the warrant requirement. *See id.*, ¶29.

¶14     A law enforcement officer exercises a community caretaker function when that officer "discovers a member of the public who is in need of assistance." *Id.*, ¶18. To determine whether an officer's conduct properly falls within the scope of the community caretaker exception, we must assess:

> (1) whether a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, whether the police were exercising a bona fide community caretaker function; and (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home.

*Id.*, ¶29.

### A. Step 1 of the community caretaker test

¶15     The parties do not dispute that Schuett's entry into Potocnik's home constituted a search within the meaning of the Fourth Amendment—they primarily disagree on whether the requirements of the second and third steps of the community caretaker test are met here. Potocnik, however, appears to argue that a Fourth Amendment search occurred when Schuett entered Potocnik's garage, which is a point in time prior to when Schuett entered Potocnik's home. Potocnik begins his argument by asserting that "[a]n attached garage is protected curtilage and peering into the windows of a residence is unconstitutional," citing ***Florida v.***

6

*Jardines*, 569 U.S. 1 (2013), among other cases. Yet, other than this general statement of the law, Potocnik argues that the totality of the circumstances does not support Schuett's entry into Potocnik's home, as opposed to Potocnik's garage.

¶16    Although Potocnik's argument is minimally developed, we generally provide pro se litigants a degree of leeway. *See **Rutherford v. LIRC***, 2008 WI App 66, ¶27, 309 Wis. 2d 498, 752 N.W.2d 897. Accordingly, we conclude that two Fourth Amendment searches occurred—when Schuett first entered Potocnik's garage and when Schuett entered Potocnik's home from the garage.[4] *See **Jardines***, 569 U.S. at 6-7.

### B.  Step 2 of the community caretaker test

¶17    The second step requires us to determine whether Schuett was exercising a bona fide community caretaker function. *See **Pinkard***, 327 Wis. 2d 346, ¶29. In other words, when he entered Potocnik's attached garage and then the residence, we must determine whether Schuett had an objectively reasonable basis to believe Potocnik was injured and in need of assistance. *See **id.***

¶18    To make that determination, we look at the totality of the circumstances at the time the search occurred. *See **id.***, ¶31. In assessing the totality of the circumstances, the subjective intent of the law enforcement officer,

---

[4] While we grant Potocnik leeway on the development of his arguments regarding whether a Fourth Amendment search occurred of his home and garage, Potocnik has not sufficiently developed an argument that a Fourth Amendment search occurred when Schuett peered into Potocnik's first and second story windows. We therefore decline to further address the propriety of Schuett's actions in this regard. *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

while not dispositive, is relevant to our analysis. *State v. Kramer*, 2009 WI 14, ¶30, 315 Wis. 2d 414, 759 N.W.2d 598. Further, courts are cautioned against "taking a too-narrow view" in determining whether an officer acted as a bona fide community caretaker. *Pinkard*, 327 Wis. 2d 346, ¶31 (citation omitted).

¶19     As an initial matter, we note that Potocnik argues Schuett was not acting as a community caretaker based upon facts and circumstances existing prior to Schuett's entry into Potocnik's garage and, subsequently, his home. In fact, Potocnik makes no meaningful argument that the totality of the circumstances available to Schuett when he entered Potocnik's garage are materially different than those circumstances available to Schuett when he entered Potocnik's home. For the reasons discussed below, we conclude Schuett had been acting as a community caretaker when he entered Potocnik's garage and home. We further note our analysis generally refers to Schuett's entry into both Potocnik's home and garage due to the overlap in facts and Potocnik's failure to argue a distinction in the totality of the circumstances analysis between the two separate searches at issue.

¶20     The totality of the circumstances known to Schuett before he entered Potocnik's garage, and subsequently Potocnik's home, objectively demonstrated that Schuett was acting as a bona fide community caretaker. Schuett observed a vehicle involved in an accident that had sustained devastating damage—the truck was lying on its side with two of its doors sheared completely off and the rear window blown out. The truck hit a pine tree with such force that its top snapped off over six feet above the ground. Based upon Schuett's observation of the wreckage, his training, and his experience, he believed that the driver must have been ejected. Accordingly, although the truck's driver was missing, Schuett could reasonably infer that the driver likely required medical assistance given the truck's

state and the driver's likely ejection from the vehicle during an apparent high force impact with the pine tree.

¶21    Given the above information and having determined that Potocnik was the vehicle's registered owner, the record supports the circuit court finding that it was reasonable for Schuett to travel to Potocnik's home to check on his well-being.  As Schuett explained, he "felt it was [his] responsibility to make sure that the driver was ok."  Schuett's subjective intent of driving to Potocnik's home to check on his well-being—as opposed to investigating him for his involvement in a possible crime—is relevant to our totality of the circumstances analysis.  *See Pinkard*, 327 Wis. 2d 346, ¶54.  Schuett's concern for Potocnik's welfare favors a determination that Schuett was acting as a bona fide community caretaker when he entered both Potocnik's garage and home.  *See id.*, ¶53.

¶22    Other information Schuett acquired outside Potocnik's garage and home further supports the circuit court's finding that Schuett reasonably believed Potocnik required medical assistance.  The home's lights were on and the doors to both the home and garage were unlocked—facts suggesting a person was present at the home.  Moreover, Potocnik was not hiding his presence inside the home from Schuett because he observed Potocnik walking past windows.  Based on these facts, and the severe damage to the truck, Schuett could reasonably surmise that Potocnik was the truck's driver and could be traumatized or suffering from injuries sustained in the crash.

¶23    The evidence also supports the circuit court's finding that Schuett "took progressive, minimally intrusive steps in order to respond to someone that he reasonably believed needed assistance."  Schuett reasonably believed that Potocnik was at home and ultimately saw him through its windows.  Potocnik,

9

however, did not respond to Schuett's many knocks and announcements. Lacking a response from Potocnik, Schuett opened the house door, but he did not enter the home until he heard someone moaning in pain from inside, suggesting an immediate need to respond to an ongoing emergency.

¶24 Potocnik argues that we should not consider that Schuett heard Potocnik moaning under the totality of the circumstances. Potocnik asserts "any attempt by the State to create a 'moaning' argument for entry to the home is mistaken" because it was "[o]nly after Schuett opened Mr. Potocnik's door did he hear moaning or yelling." Potocnik's argument, however, makes no material difference in our analysis. Schuett had been acting as a bona fide community caretaker before he entered the home, when he entered Potocnik's garage. Thus, even without considering that Schuett heard Potocnik moaning in our totality of the circumstances analysis, Potocnik's argument is a nonstarter.

¶25 Potocnik alleges that Schuett unreasonably believed Potocnik was injured and in need of assistance because Schuett saw Potocnik through the window walking in his own home without any visible injuries. In Potocnik's view, because Schuett saw Potocnik naked, Schuett could visibly confirm that Potocnik was uninjured, and, consequently, there was no need for further contact. We disagree.

¶26 We acknowledge that Potocnik's lack of any visible injuries is a fact that, when viewed in isolation, militates against concluding that Schuett was acting as a bona fide community caretaker. However, contrary to Potocnik's assertion, Schuett's belief that Potocnik required medical attention was reasonable notwithstanding Schuett's observation that Potocnik had no visible injuries. After all, a person can be injured without having visible signs of the injury. We must

analyze the circumstances in their totality, as opposed to viewing one fact in isolation. *See Pinkard*, 327 Wis. 2d 346, ¶31 (citation omitted). In the same vein, we are counseled not to take a too-narrow view in determining whether Schuett had been acting as a bona fide community caretaker. *See id.*, ¶33.

¶27    For the foregoing reasons, we conclude Schuett was acting as a bona fide community caretaker when he entered Potocnik's garage and home. Schuett reasonably believed that Potocnik likely had been involved in a severe motor vehicle accident, that he had been ejected from his vehicle, and that he needed medical attention.

*C. Step 3 of the community caretaker test*

¶28    The third step of the community caretaker analysis requires us to balance "whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home." *Id.*, ¶29. We answer this question by applying a four-part test balancing the public interest or need that is furthered by the officer's conduct against the degree and nature of the intrusion on the citizen's constitutional interest. *Id.*, ¶41. We consider:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the [search], including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.[5]

---

[5] The third consideration is irrelevant in this case because Schuett entered a home and not an automobile. *See State v. Gracia*, 2013 WI 15, ¶27, 345 Wis. 2d 488, 826 N.W.2d 87. Both parties appropriately do not discuss it.

11

*Id.*, ¶¶41-42 (citations and footnote omitted).

> ### i. *The degree of the public interest and the exigency of the situation*

¶29 Potocnik asserts the exigency of the situation did not demand that Schuett enter the home. Potocnik argues "the State speculates that, based on how the truck was damaged, [he] must have been injured." For support, he contends that there was "no blood at the scene or any other physical evidence of bodily injury." Focusing on parts of his truck that remained intact and its undeployed airbags, Potocnik argues that "it is more logical to assume the operator was not injured."

¶30 We reject Potocnik's argument. Schuett was not speculating that Potocnik was injured. Rather, as discussed above, Schuett could reasonably infer from the facts with which he was confronted that Potocnik required immediate medical attention. A reasonable inference is "a conclusion reached on the basis of evidence and reasoning." *Water Well Sols. Serv. Grp. Inc. v. Consolidated Ins. Co.*, 2016 WI 54, ¶38, 369 Wis. 2d 607, 881 N.W.2d 285. When officers are confronted with facts that could have an innocent explanation, they are not required to infer innocence as long as the inference that they do draw is supported by evidence and reasoning. *See State v. Waldner*, 206 Wis. 2d 51, 59-60, 556 N.W.2d 681 (1996) (analyzing whether the reasonable inferences a law enforcement officer drew amounted to reasonable suspicion under the Fourth Amendment). Moreover, the public "has a significant interest" in law enforcement officers ensuring the safety of a home's occupants, particularly when they cannot readily ascertain the occupants' physical condition and "reasonably conclude" that medical assistance is needed. *State v. Matalonis*, 2016 WI 7, ¶59, 366 Wis. 2d 443, 875 N.W.2d 567; *see also State v. Gracia*, 2013 WI 15, ¶25, 345

12

Wis. 2d 488, 826 N.W.2d 87 ("The public has a substantial interest in ensuring the safety of drivers in serious traffic accidents.").

¶31    The Fourth Amendment does not require officers to ascertain with one hundred percent certainty an occupant's condition, as Potocnik suggests, before entering a home without a warrant to render emergency assistance. *See Matalonis*, 366 Wis. 2d 443, ¶59; *Pinkard*, 327 Wis. 2d 346, ¶¶46-48.  Instead, the Fourth Amendment requires a reasonable certainty, which is what Schuett acted upon here.

¶32    Schuett reasonably inferred that Potocnik drove the truck involved in the accident and that he had been ejected from that vehicle.  Schuett heard Potocnik moaning as if in pain and observed that Potocnik failed to respond to Schuett's repeated knocking and announcements.  Schuett could reasonably infer that Potocnik was suffering from a traumatic head injury (such as a concussion) or other injury that would not necessarily have produced blood at the scene or on his body.  Common sense dictates that time is of the essence to acquire medical attention for individuals who may have sustained a head or other injury.  These facts, taken together, raise more than mere speculation; they raise a reasonable inference that Potocnik was injured and needed immediate medical assistance.  Thus, although we agree with Potocnik that some of the facts presented to Schuett could have permitted an inference that Potocnik did not need medical attention, we conclude, when viewing the situation's entirety, that Schuett reasonably determined that the situation was exigent.

*ii.  The attendant circumstances surrounding the search*

¶33    Moving to the second consideration of the four-part balancing test, Potocnik argues that the attendant circumstances of "time" and "location"

surrounding the search weigh in his favor. Potocnik first asserts that the situation lacked exigency because "we must speculate about the time" that his truck struck the tree. Specifically, he argues any exigency became "stale or mute" because there is no evidence as to "how much time passed from the accident occurring to the accident being noticed."

¶34 We disagree with Potocnik and conclude that the "time" factor here favors a determination that Schuett's actions were appropriate under the circumstances. Potocnik largely misinterprets the context in which "time" is analyzed within the four-part balancing test. Our supreme court explained in *Pinkard* that courts should analyze whether law enforcement officers had "control" of the time of day or location at which the home entry occurred and "the amount of time that passed" prior to the home's entry. *See Pinkard*, 327 Wis. 2d 346, ¶49 (collecting cases that found officers acted reasonably when they waited thirty and ninety minutes, respectively, before entering a home after arriving on its premises).

¶35 Here, Schuett lacked control over the time of day when his entry into Potocnik's home occurred because he had been dispatched to investigate the crash in response to a tip from a passerby. Additionally, Schuett did not immediately enter Potocnik's home when he arrived on the premises, but rather waited to investigate and determine whether the facts known to him required his warrantless entry. While the facts are unclear on exactly how long Schuett waited, the circuit court found that he arrived on the premises at approximately 2:30 a.m. and arrived at the hospital with Potocnik at approximately 4:00 a.m. During that one and one-half hour window, the court found that Schuett took a number of progressive, minimally intrusive steps before entering Potocnik's home. Schuett did not rush to enter the home, nor did he unreasonably wait to do so. We therefore conclude

14

the "time" factor favors a determination that Schuett's actions were appropriate under these circumstances.

¶36 As to "location" under the four-part balancing test's second consideration, Potocnik argues that the further a person is located from the scene of an accident, the less likely it is that person sustained a serious injury. In this case, Potocnik lived approximately eight miles from the scene of his vehicle's crash. Citing only to *State v. Ultsch*, 2011 WI App 17, 331 Wis. 2d 242, 793 N.W.2d 505 (2010), Potocnik argues that in "the cases where the courts have found it constitutionally permissible for the police to enter a home under the community caretaker exception … there is a damaged vehicle parked in the general location of the home which is subsequently searched." We are not persuaded by this argument, for a few reasons.

¶37 To begin, *Ultsch* is inapposite. There, police officers investigated an early-morning traffic accident in which a driver, later identified as Ultsch, had smashed into a brick wall and fled the scene in the vehicle. *Id.*, ¶2. The officers found the damaged vehicle—a "large, heavy SUV"—at the end of a private residence's long driveway two to three miles away. *Id.*, ¶¶2, 21. The SUV had sustained damage only to its left front fender. *Id.*, ¶21. When the officers saw someone leaving the house, who turned out to be Ultsch's boyfriend, the officers did not express any concern about the Ultsch's safety to Ultsch's boyfriend. *Id.*, ¶3. Similarly, Ultsch's boyfriend expressed no concern to the officers about Ultsch's condition. *Id.*, ¶25. The officers eventually went to the house, entered the unlocked front door, and found their way to Ultsch's bedroom where she was sleeping. *Id.*, ¶4. They transported her to the sheriff's department where they performed both field sobriety and chemical breath tests, after which they arrested her. *Id.*, ¶5. We concluded the officers did not have an objectively reasonable

basis to believe Ultsch was in need of assistance at the time they entered the residence. *Id.*, ¶¶21, 30.

¶38 In this case, the facts Schuett confronted indicated a greater exigency than the facts presented to the officers in *Ultsch*. Schuett had no confirmation from an occupant in Potocnik's home that he was safe. Furthermore, Potocnik's truck sustained far more damage than Ultsch's vehicle. Schuett's inability to contact anyone inside Potocnik's home—in part due to Potocnik's own unresponsiveness—and the severity of the damage Potocnik's truck sustained, make *Ultsch* an unpersuasive comparison.

¶39 The location of Potocnik relative to his vehicle is not dispositive when we consider the other attendant circumstances of Schuett's entry. Namely, "the low degree of overt authority and force" Schuett displayed suggests that he acted reasonably under the circumstances. *See Pinkard*, 327 Wis. 2d 346, ¶54. Law enforcement officers demonstrate a low degree of overt authority and force when they show concern about the health and safety of a home's occupants and when the officers go directly to the room where they expect to find those occupants. *See id.*, ¶¶54-55. In this case, Schuett entered Potocnik's home because he was concerned about Potocnik's welfare. There is no indication that Schuett employed any force or drew his weapon, and he went immediately to a bedroom where he expected to find Potocnik. We therefore conclude the low degree of overt authority and force here weighs in favor of finding that Schuett exercised his community caretaker responsibilities reasonably. In all, the second part of the balancing test weighs in favor of concluding that Schuett's exercise of the community caretaker function was reasonable.

### iii. Alternatives to the type of intrusion actually accomplished

¶40    The fourth part of the balancing test requires us to consider the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished. *Id.*, ¶42. Potocnik makes no developed argument that this consideration weighs in his favor. Instead, he makes only passing assertions that Schuett had other means to contact him—namely, by telephone—but did not do so. We determine the fourth consideration favors concluding that Schuett exercised his community caretaker duty reasonably, notwithstanding Potocnik's undeveloped argument.

¶41    First, Schuett had no feasible alternatives other than to enter Potocnik's home without a warrant. *See id.*, ¶57. Schuett could have reasonably determined that telephoning the home would have been fruitless, given Potocnik's unresponsiveness to Schuett's numerous loud knocks and announcements.

¶42    Next, we must consider whether the "citizens of the community" would have viewed Schuett's actions as poor police work had he not entered Potocnik's home and instead taken another course, "perhaps by leaving the scene to obtain a warrant or waiting for an ambulance to arrive." *See id.*, ¶59. We believe the public would consider Schuett to have been derelict in his duty had he not checked on Potocnik's welfare given the circumstances   The fourth consideration therefore favors concluding that Schuett reasonably exercised his community caretaker function.

¶43    Because the majority of the four considerations favor concluding that Schuett reasonably performed his community caretaker function, the third step of the community caretaker analysis has been satisfied. Schuett's warrantless

entry into Potocnik's garage and home was therefore reasonable under the Fourth Amendment.

## II. *The warrantless draw of Potocnik's blood*

¶44    A blood draw is a search under the Fourth Amendment.  *See Missouri v. McNeely*, 569 U.S. 141, 148 (2013).  A warrantless search of a person is presumptively unreasonable unless an exception to the warrant requirement applies.  *State v. Dalton*, 2018 WI 85, ¶38, 383 Wis. 2d 147, 914 N.W.2d 120.

¶45    "Exigent circumstances" are a recognized exception to the warrant requirement.  *Id.*, ¶39.  An exigent circumstance is one in which "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."  *McNeely*, 569 U.S. at 148-49 (citation omitted).  One well-recognized exigent circumstance is "the threat that evidence will be lost or destroyed if time is taken to obtain a warrant."  *State v. Parisi*, 2016 WI 10, ¶32, 367 Wis. 2d 1, 875 N.W.2d 619 (citation omitted).

¶46    The natural dissipation of alcohol in a person's blood stream "may present a risk" that evidence will be destroyed, thus supporting a finding of exigency in a specific case.  *Dalton*, 383 Wis. 2d 147, ¶40.  But the dissipation of alcohol in the blood does not per se create an exigency.  *Id.*, ¶42.  Rather, whether a warrantless blood draw was reasonable must be determined case-by-case based upon the totality of the circumstances.  *Id.*

¶47    A delay in a law enforcement officer's ability to procure a warrant in the regular course of his or her duties may give rise to exigent circumstances and, therefore, is particularly relevant to the totality of the circumstances analysis in

OWI cases. *See id.*, ¶40. This is so because blood test results decrease in accuracy as more time passes from the time when the alleged offense occurred. *Id.*, ¶41.

¶48 Our rules of evidence reflect this notion. *Id.* WISCONSIN STAT. § 885.235(1g) provides that the results of a blood test are automatically admissible to prove intoxication or demonstrate a prohibited alcohol concentration "if the sample was taken within 3 hours after the event to be proved." After that three-hour window, the evidence is admissible "only if expert testimony establishes its probative value and may be given prima facie effect only if the effect is established by expert testimony." Sec. 885.235(3). Thus, law enforcement officers investigating an OWI or a PAC violation have a legitimate interest in administering a blood test within the three-hour window for automatic admissibility of blood test results because those results decrease in accuracy as more time passes. *See Dalton*, 383 Wis. 2d 147, ¶41.

¶49 The ultimate question is whether Schuett, under the circumstances known to him at the time, reasonably believed that a delay in procuring a warrant would risk an adverse effect upon the evidence—namely, the dissipation of alcohol and the inability to obtain automatic admissibility of the evidence of alcohol concentration in Potocnik's blood. *See id.*, ¶43. We conclude Schuett's belief was reasonable under the totality of the circumstances.

¶50 A passerby notified law enforcement of the accident at 1:25 a.m. Potocnik and Schuett arrived at a hospital at approximately 4:00 a.m., and Schuett believed obtaining a search warrant for a blood draw would take at least one more hour. Schuett testified he was aware that alcohol dissipates rapidly in the bloodstream. The dissipation of alcohol in Potocnik's blood during the rapidly

closing three-hour window to accomplish a presumptively admissible and accurate blood draw presented Schuett with exigent circumstances because circumstances outside of his control and the regular course of his law enforcement duties prevented him from timely applying for and obtaining a warrant.

¶51     Further, when a defendant's actions delay a law enforcement officer from timely applying for and obtaining a search warrant, that delay makes the officer's decision to order a warrantless blood draw more reasonable. *See State v. Tullberg*, 2014 WI 134, ¶43, 359 Wis. 2d 421, 857 N.W.2d 120. A defendant that leaves an accident scene on his or her own accord is an example of such a delay. *See id.*, ¶46. Here, Potocnik left the crash scene, substantially delaying Schuett's ability to determine whether he had probable cause to believe Potocnik had operated a motor vehicle while intoxicated. Consequently, Potocnik's actions, not Schuett's, hindered Schuett's ability to secure a search warrant for a blood sample within the three-hour window to ensure its accuracy and admissibility, thereby adding to the situation's exigency.

¶52     Next, Schuett's investigation of the crash scene necessarily delayed his ability to obtain a search warrant. When confronted with an accident scene, a law enforcement officer "should first attend to the emergency circumstances at hand." *Dalton*, 383 Wis. 2d 147, ¶45. Here, Schuett spent approximately one hour searching the crash scene and nearby area for the truck's driver, whom Schuett reasonably believed had been ejected from the truck. His decision to thoroughly investigate the area around the crash for the driver before attempting to contact Potocnik at his home was reasonable, especially in light of the crash's severity.

¶53    Finally, Schuett faced uncertainty at the hospital regarding whether Potocnik would even be available for a blood draw if Schuett obtained a search warrant.  From prior experience, Schuett knew that Potocnik might need to be transported by helicopter to another facility for medical treatment.  A defendant's potential unavailability due to impending medical procedures is a fact that adds to a situation's exigency.  *See* ***Tullberg***, 359 Wis. 2d 421, ¶48.  Schuett and Potocnik arrived at the hospital approximately two and one-half hours after Schuett had arrived at the crash scene.  Again, Schuett reasonably believed obtaining a search warrant would take at least one more hour—further risking the accuracy and admissibility of Potocnik's blood test result.  Under these circumstances, Schuett could not have "reasonably obtained a warrant without significantly undermining the efficacy of the search."  *See* ***id.*** (citation omitted).

¶54    Potocnik argues that "[a]ny 'exigency' is speculation" because "there is no known time of operation of the vehicle in question."  He claims that without "a starting point for any exigency," Schuett could not reasonably believe that circumstances justified the warrantless draw of Potocnik's blood.  We are unpersuaded.  He does not cite any legal authority supporting the proposition that the exigent circumstances exception cannot be applied in an OWI case in which the exact time of a crash cannot be ascertained.  Further, Schuett knew that every minute that passed further reduced the accuracy and admissibility of the blood draw and increased the likelihood Potocnik might be moved to another hospital.

¶55    Moreover, Schuett could reasonably conclude that Potocnik had crashed his vehicle recently.  Potocnik was unresponsive and moaning in pain before Schuett entered the home.  Potocnik then acknowledged that "he had been in an accident" and replied "sure, whatever man" when Schuett asked if Potocnik wanted an ambulance.  Potocnik had also been "making noises … like he was in

21

pain" and told Schuett that he was in pain. Thus, even if Schuett did not know exactly when Potocnik crashed his vehicle, Schuett could reasonably determine based on Potocnik's conduct that it had happened recently such that he was justified in ordering a draw of Potocnik's blood due to exigent circumstances.

¶56 Viewing the totality of these facts and circumstances, Schuett reasonably responded to the crash scene, investigated the matter at two different locations, and ultimately was left with a very narrow time frame within which Potocnik's blood could be drawn to produce reliable evidence of intoxication. "This sort of 'now or never' moment is the epitome of an exigent circumstance." *Id.*, ¶50. Schuett acted reasonably under these circumstances. We therefore conclude that exigent circumstances justified the warrantless draw of Potocnik's blood.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

22